Joseph AVERI, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 619-87 C.

United States Claims Court.

May 17, 1991.

---

Janet Cooper, Washington, D.C., for plaintiffs.

Agnes M. Brown, with whom were Asst. Atty. Gen. John R. Bolton, David M. Cohen and Robert A. Reutershan, Washington, D.C., for defendant.

## OPINION AND ORDER

TURNER, Judge.

Plaintiffs are eighteen radio broadcast technician foremen presently or formerly employed by the Voice of America.[1] They seek back pay and benefits of approximately $200,000 based on assertions that the Office of Personnel Management wrongfully applied pay cap statutes to them and abused its discretion by failing to establish a special pay plan for them after implementation of the pay cap statutes.[2]

---

1. VOA is a radio station operated as a division of the United States Information Agency. It broadcasts radio shows in many languages to virtually all countries around the world, seven days a week, twenty-four hours a day. The purpose of the broadcasts is to communicate the views of the American government and to provide information about all aspects of democracy and American life.

2. While plaintiffs' briefs also attack the acts and omissions of VOA, their complaint actually concerns OPM's actions. Under the prevailing rate pay statute, OPM has authority to designate a lead agency for a wage area to establish appropriate wage schedules for prevailing rate employees after conducting wage surveys and analyzing wage survey data. 5 U.S.C. § 5343(a)(2). If no lead agency is designated, OPM becomes the pay-fixing authority. 5 U.S.C. § 5343(a)(4); 5 C.F.R. § 532.105. Since no lead agency was designated by OPM to set plaintiffs' rates, VOA must apply the rates established by OPM. VOA,

The matter stands on cross-motions for summary judgment.[3] For reasons stated below, it is concluded that plaintiffs' motion must be denied and that defendant is entitled to summary judgment.

## I

An understanding of plaintiffs' legal claims and of their requests for relief requires an understanding of the prevailing rate pay system and the authority of federal agencies to implement the system.

Most clerical, managerial and professional employees in the Executive Branch receive salary pursuant to the so-called General Schedule which classifies employees for pay purposes by various grades and steps within grades. See 5 U.S.C. § 5104. In contrast, Executive Branch employees with certain skills and in certain trades are paid pursuant to a "prevailing rate" system established by Congress ostensibly to match the pay of such employees with that of similar private sector employees in the same geographic area.[4] (The Congressional directive to Executive Branch pay-fixers is to achieve this match "as nearly as is consistent with the public interest." 5 U.S.C. §§ 5343(a), 5348 and 5349.) Wage schedules based on the prevailing private sector rates are designated "regular wage schedules." 5 U.S.C. § 5343.

The statutory scheme for the prevailing rate system contemplates that recruitment and retention of some skills may require adjustments to prevailing rates. OPM is authorized to devise "special wage schedules," 5 U.S.C. § 5343(c)(3)(B) & (e)(4), to attract and retain employees with needed skills when a regular prevailing rate schedule would be ineffective. Pursuant to such statutory authorization, OPM has promulgated regulations controlling the develop-

ment of special pay programs. 5 C.F.R. § 532.105.

## II

Approximately 150 radio broadcast technicians (RBTs) are employed by VOA to handle all technical aspects of recording and radio broadcasting. These technicians are supervised by radio broadcast technician foremen, including plaintiffs. It is undisputed that the nature of the work performed by the foremen differs significantly from that performed by the technicians. The foremen have more authority and responsibility than the technicians.

Both technicians and foremen are prevailing rate employees as defined in 5 U.S.C. § 5342(a)(2)(A). Unlike foremen, the technicians negotiate their wages through collective bargaining and are represented by the National Federation of Federal Employees (NFFE), Local 1418. Because of their status as supervisors, the foremen are excluded from the bargaining unit of technicians.

The collective bargaining agreement governing wage rates for radio broadcast technicians from 1979 to 1984 contained a pay-setting formula that set rates based on surveys of comparable positions in the private sector. In 1984, VOA renegotiated its contract with NFFE. The new contract set pay increases for technicians at 5% per year through January 1988 and established a two-tier pay structure under which newly hired technicians were paid on a different scale with lower rates and more steps to the top of the grade (PX 20). (The higher-rate schedule for the "grandfathered" technicians was designated AD–2; the lower-rate schedule for newly hired technicians was designated WB–2.) This action was taken in response to VOA's recognition

---

therefore, does not have the power to redress plaintiffs complaints.

**3.** Plaintiffs' motion for summary judgment was filed on August 17, 1988; Defendant's cross-motion for summary judgment (alternative to its motion to dismiss) was filed on November 7, 1988.

**4.** Prevailing rate employees are defined in 5 U.S.C. § 5342(a)(2)(A) as individuals "in a recognized trade or craft, or other skilled mechanical craft, or in an unskilled, semiskilled, or skilled manual labor occupation, and any other individual, *including a foreman and a supervisor,* in a position having trade, craft, or laboring experience and knowledge as the paramount requirement." (Emphasis added.)

that then existing pay rates for technicians were unrealistically high.

The foremen's wage classification history is convoluted. Since 1959 they have been classified under several different wage systems. As a result, between 1959 and 1981, the wages of the foremen and their subordinates, the technicians, became compressed.[5] In response to a request from VOA, OPM remedied this situation in 1981 by establishing a *special* wage schedule for the foremen. *See* 5 U.S.C. § 5343(e)(4); 5 C.F.R. § 532.105. The 1981 *special* pay schedule linked the foremen's rate of pay directly to that of the technicians. It provided a single wage rate for foreman set at 111.5% of the negotiated technicians rate.[6] Adoption of the 1981 *special* pay plan for foreman corrected all pre-existing compensation problems and appeared to provide a long term solution. (The events of which plaintiffs complain occurred after 1981).

After OPM established the special wage schedule for VOA foremen in 1981, Congress circumvented its effect by legislating pay caps applicable to prevailing rate employees. During fiscal years 1983 through 1987, these pay caps applied to any prevailing rate employee described in 5 U.S.C. § 5342(a)(2)(A) except when the caps conflicted with the terms of a collective bargaining agreement.[7] Thus, VOA technicians were exempted from limitations on pay increases under this Congressional scheme while the foremen were not. The effect of capping the foremen's wages was to create a new pay compression problem, eventually leading to pay inversion with respect to some of the technicians. The pay cap legislation covering fiscal years 1988, 1989 and 1990 did not exempt from application of the pay caps those employees who negotiate their wages through collective bargaining agreements.[8] Consequently, events giving rise to the complaint ended with fiscal year 1987.

After the pay caps were applied, the foremen received pay increases ranging from 0% to 4% during the fiscal years 1983 through 1987[9] (PX 70). Meanwhile, the technicians received pay increases of 5% each year during the same period pursuant to their collective bargaining agreement (PX 20). The foremen received pay increases limited to 2% in FY 1988 and 4.1%

---

5. Pay compression results when two groups of employees whose salaries are determined according to an established differential receive pay increases of unequal percentage rates. If the subordinate group receives more frequent pay increases or increases at a greater percentage rate, then their wages gradually overtake those of their supervisors. Pay inversion results when the pay of the subordinate group actually exceeds that of the supervisory group which has more responsibility and authority.

6. The foreman's rate was actually set at 111.5% of the third step of the nonsupervisory rate. The third step, nonsupervisory rate corresponded to the top step rate of the private sector jobs surveyed.

7. For FY 1983, see Pub.L. 97–276, 96 Stat. 1191, §§ 109(a), 109(b); Pub.L. 97–377, 96 Stat. 1909, §§ 107(a), 107(b), 107(f). For FY 1984, see Pub.L. 98–151, 97 Stat. 964 §§ 101(a), 101(f); Pub.L. 98–270, 98 Stat. 158, § 202(b); Pub.L. 98–369, 98 Stat. 1058, § 2202(a). For FY 1985, see Pub.L. 98–473, 98 Stat. 1963, § 101(j). For FY 1986, see Pub.L. 99–272, 100 Stat. 332, § 15201(b). For FY 1987, see Pub.L. 99–500, 100 Stat. 1783–330, Section 101(m), §§ 613(a)–

(i); Pub.L. 99–591, 100 Stat. 3341–330, Section 101(m), §§ 613(a)–(i).

8. Pub.L. 100–202, 101 Stat. 1329–421, Section 101(m), §§ 613(a)–(h); Pub.L. 100–440, 102 Stat. 1753, §§ 612(a)–(h).

9.

| FY | Pay Adjustment | Legal Basis |
| --- | --- | --- |
| 1983 | 4% | Pub.L. 97–276 §§ 109(a), (b) Pub.L. 97–377 §§ 107(a)–(f) |
| 1984 | 4% | Pub.L. 98–151 § 101(f) Pub.L. 98–270 § 202(b) Pub.L. 98–369 § 2202(a) |
| 1985 | 3.5% | Pub.L. 98–473 § 101(j) |
| 1986 | 0% | Pub.L. 99–272 § 15201(b)(1)(A) |
| 1987 | 3% | Pub.L. 99–500 Section 101(m), §§ 613(a)–(i) Pub.L. 99–591 Section 101(m), §§ 613(a)–(i) |

in FY 1989 while the previous exemption from pay caps for negotiated-rate employees was eliminated. In addition to exempting prevailing rate employees who negotiate their wages through the collective bargaining process, several pieces of pay cap legislation contained another exemption for prevailing rate supervisors based on a supervisory pay plan developed by OPM.[10] However, this exemption did not apply to VOA foremen since they were not included in the plan developed by OPM (PX 19).

Pay compression and inversion developed at VOA as a result of this legislative scheme which capped the wages of foremen while allowing technicians' salaries to remain uncapped. Because of the two-tier pay structure for technicians negotiated in 1984, pay inversion only became a problem vis-a-vis the older, grandfathered technicians paid according to the AD–2 schedule.[11] Currently, VOA recognizes the WB–2 schedule as the only continuing pay schedule for technicians and is phasing out the AD–2 schedule. VOA will not hire any new AD–2 employees and those who leave will be replaced by technicians paid according to the WB–2 schedule (PX 20).

On May 13, 1987, VOA proposed a new pay plan to OPM for short-term relief for its foremen from the pay compression and inversion problems. In that proposal, VOA recognized that "the root cause of pay inversion is excessively high pay levels for the grandfathered AD–2 RBTs." VOA also stated that its "long-term approach to resolving pay inversion is to address the AD–2 pay schedule in [its] 1988 negotiations" (PX 20). In the same proposal, VOA recognized that the WB–2 pay scale may also create pay inversion problems unless changed through negotiation and that such negotiations might lead to impasse. VOA's

1987 proposal was only for short term relief, "simply to get [VOA] through the time required to re-negotiate the pay structure for the non-supervisory RBTs" (PX 20).

On July 21, 1987, OPM denied VOA's request for a *special* wage schedule for its foremen (PX 80). OPM announced its reluctance to pursue a single agency *special* schedule for VOA since there was then no pay inversion between the foremen and the WB–2 RBTs and because no recruitment or retention problems appeared to exist at VOA. Under the regulations, special schedules may be established only when there is evidence of a serious recruitment and retention problem. 5 C.F.R. § 532.231. OPM has the authority to determine that a recruitment and retention problem exists and it did not do so in this case. Although VOA contends that such a problem exists, OPM must make any such finding under the statutory and regulatory scheme.

OPM also stated that since 1979 it had encouraged agency heads to apply the annual wage increase limitations to pay rates negotiated through the collective bargaining process and that other agencies have applied pay cap limitations and delays to negotiated rate employees (PX 80). Furthermore, OPM made clear its position that "special schedule linkages to negotiated rate employees can only be addressed through responsible agency negotiations which apply the full Federal pay caps and delays" (PX 80). OPM encouraged VOA to restructure both the AD–2 and WB–2 pay scales so that an appropriate long-term differential is established between the negotiated rate employees and the foremen. OPM also indicated its willingness to reconsider a new special pay plan for the foremen after the 1988 contract negotiations were completed (PX 80).[12]

---

10. Pub.L. 97–377, 96 Stat. 1909, § 107(f); Pub.L. 98–151, 97 Stat 964, 973, § 101(f); Pub.L. 98–270, 98 Stat. 158, § 202(b)(3); Pub.L. 98–473, 98 Stat. 1963, § 101(j).

11. The WB–2 pay schedule negotiated for post–1984 RBTs ranges from a low of $12.25 per hour at the first step to a high of $21.15 per hour at the tenth step. As of May 13, 1987, VOA employed 47 WB–2 technicians, the highest paid of which was at the sixth step earning $17.81

per hour. VOA also employed 104 grandfathered RBTs all at the rate of $22.83 per hour. The single rate applicable to the foremen was $21.41. These foremen, therefore, earn less than 104 of the 151 technicians that they supervise (PX 20).

12. At oral argument on the cross-motions for summary judgment held on April 25, 1990, plaintiffs' attorney indicated that the 1988 wage negotiations were still at an impasse and the

In response to a request from VOA (PX 85), the Comptroller General of the United States issued an opinion addressing the issue of whether a pay increase for VOA foremen may be excluded from the pay caps imposed by law on most prevailing rate employees (PX 86). The Comptroller General held that the pay increase for VOA foremen is subject to the pay caps even though their subordinates negotiated higher wage increases and were excluded from the limitation. *Voice of America,* 64 Comp.Gen. 100 (1984), *aff'd on reconsideration* 65 Comp.Gen. 434 (1986). On reconsideration, the Comptroller General affirmed its decision (PX 90) and held that the foremen are covered by the terms of the statute limiting pay increases and may not be excluded based on prior GAO decisions involving linkage between groups of prevailing rate employees or based on court decisions involving prevailing rate employees who were not subject to the statutory pay limitations. *Id.* Thereafter, plaintiffs filed this action seeking back pay and benefits which they contend have been withheld illegally from them as a result of the unlawful application of the wage increase limitations.

### III

#### A. *Jurisdiction*

■ The parties concur that plaintiffs are prevailing rate employees described and entitled to have their pay "fixed and adjusted from time to time" pursuant to 5 U.S.C. § 5343. It is important to note, however, that plaintiffs are not complaining that they are not receiving the prevailing rate for their position. Rather, plaintiffs complain that the compression and, with respect to some technicians, inversion resulting from the pay cap legislation violates the statutory policy recognizing differences in duties and responsibilities contained in 5 U.S.C. § 5341. Section 5341 states as follows:

It is the policy of Congress that rates of pay of prevailing rate employees be *fixed and adjusted from time to time* as nearly as is consistent with the public interest in accordance with prevailing rates and be *based on principles* that—
(1) there will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area;
(2) *there will be relative differences in pay* within a local wage area *when there are substantial or recognizable differences in duties, responsibilities, and qualification requirements among positions;*
(3) the level of rates of pay will be maintained in line with prevailing levels for comparable work within a local wage area; and
(4) the level of rates of pay will be maintained so as to attract and retain qualified prevailing rate employees.

(Emphasis added.)

Plaintiffs rely primarily on § 5341(2) and argue that because Congress used the term "will" in this section, it represents a Congressional mandate that there be a differential between the pay rates of the supervisors and those of the technicians at VOA. Plaintiffs further allege that OPM established this differential when it set their rate of pay at 111.5% of their subordinates, but that OPM violated § 5341 when it failed to maintain this differential by subjecting the foremen to the pay increase limitations. In addition, plaintiffs argue that after OPM wrongfully applied the pay caps to them in violation of § 5341, it abused its discretion by failing to establish a *special* pay plan to alleviate the resulting pay compression and inversion problems.

Since § 5343 mandates the payment of money to VOA foremen, it vests the Claims Court with jurisdiction to determine whether money to which they were lawfully entitled was wrongfully withheld from them by applying the pay cap legislation. *Bradley v. United States,* 870 F.2d 1578 (Fed.Cir. 1989). However, § 5343 is not a money-mandating statute for jurisdictional purposes with regard to plaintiffs' claim that OPM abused its discretion by not establish-

---

technicians' salaries had been frozen during the    interim.

ing a special pay plan to relieve the pay inversion problems after the pay caps were implemented. This section does not give the Claims Court power to review OPM's actions for an abuse of discretion when no underlying entitlement to money damages exists. If OPM had established a special pay plan for the foremen after the pay cap statutes were implemented, then the foremen would have a legal right to sue for the additional pay under § 5343. They have no right to sue for money that OPM never determined they were entitled to receive, and OPM is not required by statute to establish a special pay plan to correct pay inversion problems created by Congress.

The plaintiffs in this case were entitled to the benefit of the special pay schedule established for them by OPM at the rate of 111.5% of the salary of their subordinates until Congress overrode the special pay schedule by enacting pay cap legislation. Thereafter, OPM had authority to develop special pay plans for agencies only if it determined that a serious recruitment and retention problem existed. 5 C.F.R. § 532.231. Since OPM has not decided that any such problem was present at VOA, the foremen have no entitlement to money damages which would give rise to Claims Court jurisdiction over their claim for abuse of discretion.

### B. *Applicability of the Pay Cap Statute to VOA Foremen*

█ The statutes imposing pay caps on prevailing rate employees during the fiscal years 1983 through 1987 contained similar language. A representative example is found in Pub.L. 97–377, 96 Stat.1909, § 107 (Dec. 21, 1982) which states:

(a) Notwithstanding any other provision of law, no part of any of the funds appropriated for the fiscal year ending September 30, 1983, by this Act or any other Act, may be used to pay any prevailing rate employee described in section 5342(a)(2)(A) of title 5, United States Code, ... in an amount which exceeds ... [rates in effect at the end of the preceding fiscal year] by more than [the average percentage adjustment to the General Schedule].

(b) Notwithstanding the provisions of section 9(b) of Public Law 92–392 or section 704(b) of the Civil Service Reform Act of 1978 [which preserve the right of prevailing rate employees whose wages are governed by contract to enter into wage negotiations], the provisions of subsection (a) of this section shall apply (in such manner as the Office of Personnel Management shall prescribe) to prevailing rate employees to whom such section 9(b) applies, *except that the provisions of subsection (a) may not apply to any increase in a wage schedule or rate which is required by the terms of a contract entered into before the date of enactment of this Act.*

. . . .

(f) Notwithstanding the limitations imposed on prevailing rate pay pursuant to subsection (a) of this section ... *such limitations shall not apply to wage adjustments for prevailing rate supervisors provided by the supervisory pay plan published in the Federal Register on May 21, 1982. (47FR22100).*

(Emphasis added.)

The express language of the statute makes clear that the pay caps apply to any prevailing rate employee described in 5 U.S.C. § 5342(a)(2)(A). Both technicians and foremen employed by VOA are prevailing rate employees under § 5342(a)(2)(A), and thus, by the terms of the statute, the pay caps apply to them. The statute provides two exceptions to the pay caps. The first exception contained in § 107(b) *clearly applied to VOA technicians and removed them from the pay freeze.* The second exception contained in § 107(f) exempted certain groups of supervisors *but did not exempt VOA foremen.*

OPM released the following guidelines for implementing pay cap legislation in bulletins issued to agency heads:

An increase in a wage schedule or rate is 'required by the terms of a contract' only if:

a) the contract dictates specific rates of pay, or specific monetary or percentage increases; or

b) the contract dictates a fixed pay-setting procedure which results in a specific increase; however, none of the elements of the pay-setting procedure may be subject to further negotiation by the parties.

PX 49, 54.

Following these guidelines, the technicians were expressly excluded from application of the wage increase limitation by § 107(b) since their wage rate was required by the terms of a contract negotiated through the collective bargaining process.[13] Plaintiffs argue that foremen were also excluded from the pay caps under § 107(b) of the representative statute and subsequent similar enactments because their wages are directly linked to the negotiated rate of the technicians. OPM concluded that the foremen did not fall within the § 107(b) exception since their wage rate was not required *by the terms of a contract.*[14]

It is true that the inversion resulting from application of the pay caps to the foremen's wages directly contradicts the policy provisions expressed in 5 U.S.C. § 5341(2) ("there will be relative differences in pay within a local wage area when there are substantial or recognizable differences in duties, responsibilities, and qualification requirements among positions"). Congress recognized this problem and created an exception expressly applicable to some (but not all) federal supervisors in § 107(f) of the representative pay cap statute. VOA foremen were not included within this statutory exception.

### C. *Abuse of Discretion*

■ Both the Court of Claims and the Federal Circuit have addressed the issue of abuse of discretion by federal agencies in setting wages under the prevailing rate system. Traditionally, the discretion granted to federal agencies in this area is very broad and the court's scope of review is correspondingly narrow. *Adams v. United States,* 810 F.2d 1142, 1143–44 (Fed.Cir. 1987); *National Maritime Union v. United States,* 682 F.2d 944, 955, 231 Ct.Cl. 59 (1982). Under this line of authority, the court may not interfere in an administrative wage-setting process unless there has been a flagrant abuse of discretion. *National Maritime Union,* 682 F.2d at 955; *Daigle v. United States,* 217 Ct.Cl. 376, 386 (1978); *Blaha v. United States,* 206 Ct.Cl. 183 (1975).

Unlike the aforementioned cases, this case does not involve an administrative wage-setting process such as determining what the prevailing rate should be for a particular group of employees. As previously discussed, VOA foremen do not allege that they have not been paid the prevailing rate or that it was improperly calculated. Rather, they contend that the pay cap statutes were improperly applied to them and that OPM abused its discretion by not establishing a special pay plan for them. Under these circumstances, the Claims Court does not have jurisdiction to determine whether or not OPM abused its discretion because the regulations authorizing OPM to establish special plans are not money-mandating. These regulations state:

(a) A lead agency, with the approval of the Office of Personnel Management, *may* establish special rates or special schedules for use within an area for spe-

---

**13.** VOA renegotiated its contract with the technicians in 1984. The technicians remained exempted from wage caps under similar statutory language through fiscal year 1987. For example, Pub.L. 98–270, 98 Stat. 158, § 202(b)(2) states that its wage caps shall not apply to any increase in a wage schedule or rate which is required by the terms of a contract entered into before the date of the enactment of that Act. Likewise, Pub.L. 99–272, 100 Stat. 332, § 15201(b)(3) states that its wage cap shall not apply to any increase in a wage schedule or rate which is required by the terms of a contract entered into before October 1, 1985.

In fiscal years 1988 and 1989, the negotiated wage employees were made subject to pay caps applicable to all prevailing wage employees.

**14.** Thereafter, the Comptroller General refused to accept plaintiffs' linkage argument and held that VOA foremen may not be exempted from the pay cap even though their subordinates negotiated higher wage increases and were exempted from the limitation. *See Voice of America,* 64 Comp.Gen. 100 (1984), *aff'd on reconsideration,* 65 Comp.Gen. 434 (1986).

cific occupations which are critical to the mission of a Federal activity *based on findings* that:

(1) Serious recruitment and retention problems exist;

(2) Rates on the authorized regular schedule are inadequate for the recruitment and retention of qualified employees; *and*

(3) Authorization of increased minimum rates under § 532.229 of this subpart will not solve the problems. [Section 532.229 enables the lead agency for a wage area to establish mandatory minimum rates payable by an agency when it is unable to recruit qualified employees.]

5 C.F.R. § 532.231 (emphasis added).

This language is fundamentally different from the corresponding provision of the prevailing rate wage statute, 5 U.S.C. § 5343, in which the money-mandating component is clear. ("The pay of prevailing rate employees *shall be fixed and adjusted* from time to time as nearly as is consistent with the public interest in accordance with prevailing rates." 5 U.S.C. § 5343(a)) (emphasis added).

Plaintiff suggests that OPM's failure to include VOA foremen within the supervisory exception to the pay cap statute constitutes an abuse of discretion. This contention is beyond the jurisdiction of the Claims Court because it is not based on any provision that could be considered money-mandating under the Tucker Act, 28 U.S.C. § 1491(a)(1). The supervisory exception included in several pieces of pay cap legislation resulted from a study of blue collar supervisory pay practices in the private sector conducted by OPM in 1979. The study showed that the federal government was setting pay for foremen appropriately in comparison with the private sector, but that the pay differentials between supervisors and their subordinates were too small. Accordingly, OPM implemented a new pay and grading plan during a two-year period beginning in 1983.[15] *See* H.R.Rep. No. 425,

98th Cong., *reprinted in* 1984 U.S.Code Cong. & Admin.News 355, 358–61. VOA foremen were not covered by this pay plan since OPM determined that no recruitment or retention problems existed at VOA. Since the statute and regulations providing for the establishment of special wage schedules do not mandate the payment of money by the United States, the Claims Court has no jurisdiction over a claim based on them.

### IV

The Claims Court has jurisdiction over plaintiffs' claim that OPM wrongfully applied the pay cap statutes but lacks jurisdiction to review the discretion exercised by OPM in declining to exercise its executive authority to establish a special pay plan where specified circumstances warrant. It is concluded that the pay cap statutes applied to VOA foremen and that the foremen were not excluded from application of the caps by either exception provided in the statutes.

Based on the foregoing, plaintiffs' motion for summary judgment is DENIED and defendant's cross-motion for summary judgment is GRANTED. It is, therefore, ORDERED that judgment be entered in favor of the defendant.

Pursuant to RUSCC 54(d), costs shall be allowed to the defendant ("the prevailing party").

---

**15.** The implementation began under the authority of section 107(f) of Pub.L. 97–377 which provided an exception from the fiscal year 1983 pay limitation for the purpose of ensuring that the pay differential between federal wage supervisors and their subordinates would more closely resemble private industry practices.