# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1165

_____

| | |
|---|---|
| Esther S. Taylor, | * |
| | * |
| Appellant, | * Appeal from the United States |
| | * District Court for the Eastern |
| v. | * District of Arkansas. |
| | * |
| Thomas E. White, Secretary of the | * |
| Army, | * |
| | * |
| Appellee. | * |

_____

Submitted: June 28, 2002

Filed: March 4, 2003

_____

Before WOLLMAN, MORRIS SHEPPARD ARNOLD, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

In this Title VII unequal pay case, Plaintiff/Appellant Esther S. Taylor appeals the district court's[1] grant of summary judgment in favor of her employer,

_____

[1]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

Defendant/Appellee Secretary of the Army Thomas E. White (the Army). Because Taylor failed to identify evidence that would create a genuine question of material fact to rebut the Army's affirmative defense, we affirm.

I.

Taylor was a civilian employee at the Army's Pine Bluff, Arkansas Arsenal (the Arsenal). From early February 1995 through June 1998, she worked on a temporary program known as the Munitions Items Disposition Action System or MIDAS. Taylor's duties under the MIDAS program related to the preparation of detailed technical reports to describe unwanted conventional munitions. The purpose of the MIDAS program was to facilitate the disposal of these munitions.

Taylor was not a veteran, but she had worked for the Arsenal for many years before joining the MIDAS program. She first worked for the Arsenal from 1963 through 1969, at which time she quit to raise her family. In 1981 she returned to the Arsenal as a grade GS-4 timekeeper in the office of the Directorate of Manufacturing Operations.[2] Between 1983 and 1993 she worked as a munitions inspector and progressed in salary and title from grade WG-6 munitions inspector to grade WG-9 munitions inspector.[3] In 1993, through a formal reduction-in-force process, she was downgraded and transferred to the Arsenal's Directorate of Product Assurance as a grade GS-4 quality assurance clerk.

---

[2]GS or General Schedule refers to a government pay scale used to classify employees and positions.

[3]The WG pay scale is separate from the General Schedule. It is applicable to certain jobs at the Arsenal. Generally, for a given numerical grade (e.g. GS-4 and WG-4), WG salaries are lower than GS salaries.

Due to application of the statutory salary retention policy of 5 U.S.C. § 5362, Taylor was entitled to retain her higher, WG-9 grade and salary for a limited period of time following the reduction-in-force.[4] Therefore, immediately prior to joining the MIDAS program under the Directorate of Product Assurance in 1995, she worked as a GS-4 quality assurance clerk in the Directorate of Product Assurance but received statutorily protected pay at the WG-9 level. She does not allege that her demotion during the earlier reduction-in-force involved discrimination or that her GS-4 ranking demonstrated historical discrimination by the Army.

Theodis J. Thornton and Willie J. Early were Taylor's male co-workers on the MIDAS program. Both were GS-11 quality assurance specialists before placement with the MIDAS program. Thornton was an Army veteran and Arsenal employee since 1978. Early was a Marine veteran and Arsenal employee since 1979. Linda Jones was Taylor's female coworker on the MIDAS program. Jones was a GS-9 engineering technician.

Prior to placement with the MIDAS program, Taylor, Early and Thornton were on the Arsenal's "surplus roster." On the surplus roster, they faced uncertain job security. The record is not clear regarding the precise nature of this uncertainty such as the likelihood or timing of possible layoffs or demotions. However, it is undisputed that Arsenal management generally attempted to fill vacant positions with surplus roster personnel to avoid layoffs. Jones was not on the surplus roster prior to her placement with the MIDAS program.

---

[4]§ 5362 mandates salary retention for certain government employees who have worked for at least 52 consecutive weeks prior to placement in a lower salaried position through a formal reduction-in-force process. Because Taylor's present complaints did not arise from a reduction-in-force process, and because they are unrelated to her earlier demotion that occurred under a reduction-in-force process, the statutory salary retention policy of § 5362 is not under examination.

The MIDAS program originally had the potential to be funded for three years, but was obtained as a temporary program of uncertain duration. Ultimately, control over the MIDAS program rested with the U.S. Army Defense Ammunition Center and School in Savannah, Illinois. Local control over the MIDAS program at the Arsenal was originally held by the Arsenal's Directorate of Engineering and Technology. While Taylor, Early, and Thornton were on the surplus roster, quality assurance supervisor John Hill negotiated transfer of the MIDAS program jobs and funding from the Arsenal's Directorate of Engineering and Technology to the Directorate of Product Assurance. Hill was able to obtain local control of the MIDAS program from the Directorate of Engineering and Technology due to poor performance by that Directorate and due to a threat from Savannah to withdraw the MIDAS program and its funding from the Arsenal. By securing the MIDAS program for the Directorate of Product Assurance, Hill created positions for Taylor, Thornton, and Early thus removing these three employees from the surplus roster.

Taylor, her female coworker Jones, and her male coworkers Thornton and Early commenced work under the MIDAS program in late January and early February 1995. At that time, the Civilian Personnel Office (CPO) had not yet classified the MIDAS positions and duties under the GS system. Taylor, Jones, Thornton, and Early simply assumed new duties, received limited group training, and continued to receive pay at their prior, unequal, pre-MIDAS grades – Taylor at the WG-9 level, Jones at the GS-9 level, and Thornton and Early at the GS-11 level. Previously, when the MIDAS program was under the Directorate of Engineering and Technology, one of the MIDAS workers was a male rated at level GS-12. The record is unclear regarding the historical grades and duties of other, prior MIDAS workers.

Notwithstanding these different classifications and salaries, it is undisputed that during at a least a portion of their time together under the MIDAS program, Taylor, Jones, Thornton, and Early performed identical work under identical conditions. When their MIDAS work began Taylor and her co-workers shared a lack

4

of relevant experience and training. They learned to perform MIDAS work together by trial and error and through joint training.

In the summer of 1995, Hill submitted a written description of the MIDAS workers' duties to the CPO. In addition, he claims to have recommended classification of these duties at grade GS-9. In August of 1995, about six months after Taylor and her coworkers joined the MIDAS program, but before Taylor's statutory salary retention benefits expired, the CPO classified the MIDAS positions at grade GS-7. After the classification, Thornton and Early maintained their GS-11 grades and salaries. Because Jones returned to her previous position shortly before the classification, she was unaffected by the CPO's action. Jones maintained her grade GS-9 status throughout her entire tenure with the MIDAS program.

After the CPO classification, Taylor was promoted from grade GS-4 to grade GS-7. Because she had been receiving statutorily protected pay at the WG-9 level for two years, her three grade promotion did not appear to provide a dramatic salary increase. Taylor's two year benefit period under 5 U.S.C. § 5362 would have expired in October of 1995 had she not been promoted to the GS-7 level.

Jacquelyne Evans, a position classification specialist from the CPO, claims that the CPO relied on Hill's written description to classify the MIDAS duties at grade GS-7. Taylor does not dispute that the CPO relied on Hill's written description. However, she alleges that reliance on the written description was irregular and notes that Evans does not recall Hill recommending classification at grade GS-9. In addition, Taylor notes that no CPO personnel conducted a "desk audit" or personal interview of Taylor, Early, or Thornton to explore first-hand the tasks involved with the performance of their MIDAS duties. Although Taylor attacks the classification process, she presents no evidence to suggest that a desk audit was required, that such interviews were a mandatory part of the position classification process, or that reliance on a supervisor's written description was impermissible. Accordingly,

5

although Taylor has identified a question of fact regarding whether or not Hill recommended classification at grade GS-9, it is clear that the CPO did not rely on any such recommendation and Taylor's unsupported critique of the classification process cannot support an inference of discrimination.

Shortly after the CPO classification, Thornton acquired additional, non-MIDAS program duties and devoted only about fifty percent of his time to the MIDAS program. In April 1996, he was promoted to GS-12. Although Thornton continued to share some duties that were identical to those of Taylor and Early, Taylor does not allege that her workload was equal to that of Thornton's after the scope of his duties expanded. Early continued to receive a GS-11 salary under the MIDAS program until October 11, 1997, when he returned to his prior, GS-11 position. Taylor performed the same work as Early throughout this entire time but received pay at the GS-7 level. Taylor remained with the MIDAS program through its termination in May, 1997. At that time she returned to a GS-4 position to perform GS-4 duties, but maintained her GS-7 grade and salary.

In September 1995, after Taylor was promoted to grade GS-7, she met with the Arsenal's EEO Officer to complain about the disparity between her salary and the salaries of her male coworkers. The Officer made an appointment for Taylor to meet with James L. Bacon, the Executive Assistant and second-in-command at the Arsenal. In October of 1995, Bacon met with Taylor and told her that he would respond at a later time. On May 9, 1996, after receiving no response for over six months, Taylor sent Bacon a memo requesting action to correct the wage disparity and requesting a status report. Bacon did not respond to Taylor's May 9 memo. However, in the same general time frame that Bacon received Taylor's memo–six months after Taylor first complained and over sixteen months after Early's placement in the MIDAS program–Bacon's office acted to formalize and document Early's status as a GS-11 worker performing GS-7 duties. The documentation accompanying Early's change of status indicated that the change was originally requested in November 1995, was

6

not acted upon until May 1996, became effective May 12, 1996 and was to last for a period not to exceed 120 days. After Early's status was formalized, he was considered a GS-11 quality assurance specialist "detailed" to a GS-7 position.

Pay above the GS-7 level that Thornton, Early, and Jones received while under the MIDAS program was not mandated by the statutory, saved-pay provisions of 5 U.S.C. § 5362. Similarly, the out-of-grade pay received by Taylor after she left the MIDAS program was not mandated by statute. Accordingly, it is undisputed that the Arsenal employed a non-statutory salary retention policy for the employees involved in this case. The details of this non-statutory policy are disputed.

Ultimately, Taylor filed a claim with the Equal Employment Opportunity Commission followed by this suit. The district court granted summary judgment finding no evidence to rebut the Army's assertion of the non-statutory salary retention policy as a gender-neutral defense to Taylor's claim of discrimination.

II

Our review of the district court's grant of summary judgment is de novo. The district court did not find, and the Army does not contend that there is an absence of factual questions in this case. Rather, the district court and the Army assert that all outstanding questions of fact are immaterial. Accordingly, we must examine the record to assess the materiality of the disputed facts. In conducting this examination, we consider Taylor's evidence to be true and draw justifiable inferences arising from the evidence in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "If this evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted). Thus, although Taylor does not have to provide direct proof that genuine issues of fact exist for trial, the facts and circumstances that she relies "upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion." Metge v.

7

Baehler, 762 F.2d 621, 625 (8th Cir. 1985). In essence, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Taylor alleges gender-based discrimination under Title VII, 42 U.S.C. § 2000e-2(a)(1). Because her allegations of discrimination relate solely to unequal pay for equal work, her claim is governed by the standards of the Equal Pay Act, 29 U.S.C. § 206(d) (EPA). Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 718-19 (8th Cir. 2000) (conducting analysis of a Title VII claim under the framework of the EPA where the alleged discrimination related solely to unequal pay for equal work); see also Hutchings v. International Brotherhood of Teamsters, 177 F.3d 1076, 1080-81 (8th Cir. 1999) and McKee v. Bi-State Dev. Agency, 801 F.2d 1014, 1019 (8th Cir. 1986). Under the EPA, a plaintiff must establish a prima facie case by "show[ing] that the defendant paid male workers more than she was paid for equal work in jobs that required equal skill, effort, and responsibility and work performed under similar conditions." Buettner, 216 F.3d at 719. If a plaintiff makes this showing, the burden shifts to the defendant to prove one of the affirmative defenses set forth under the EPA. The last of the statutory affirmative defenses set forth in the EPA is a catch-all provision that excuses pay discrepancies "based on any other factor other than sex . . ." 29 U.S.C. §206(d)(1)(iv).[5]

---

[5] 29 U.S.C. §206(d)(1) states:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a

This analytical framework differs from the McDonnell Douglas burden shifting analysis.[6] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under the EPA, a defendant cannot escape liability merely by articulating a legitimate non-discriminatory reason for the employment action. Rather, the defendant must prove that the pay differential was based on a factor other than sex. County of Washington v. Gunther, 452 U.S. 161, 170 (1981) ("Equal Pay Act litigation, therefore, has been structured to permit employers to defend against charges of discrimination where their pay differentials are based on a bona fide use of 'other factors other than sex.'").

The Army's summary judgment motion relies solely on the EPA's catch-all, "factor other than sex" affirmative defense. 29 U.S.C. § 206(d)(1)(iv). Therefore, for the purpose of this motion, it is undisputed that Taylor established a prima facie case under the EPA. The Army argues specifically that the pay discrepancy resulted from

>merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) *a differential based on any other factor other than sex . . .* (emphasis added)

[6]The Army argues that the burden shifting analysis of McDonnell Douglas should apply in this Title VII unequal pay case. However the cases the Army cites do not support its argument. See Simmons v. New Pub. Sch. Dist. No. Eight, 251 F.3d 1210, 1214-15 (8th Cir. 2001). Simmons was not exclusively an unequal pay case. Id. (refusing to apply the burden shifting analysis to a gender discrimination claim that was based on the non-renewal of an employment contract). Further, the court in Simmons only applied the McDonnell Douglas analysis to a claim based on unequal pay because there was no direct evidence that the plaintiff was paid less than the employee chosen for comparison, her eventual replacement. Id. at 1217. In Kindred v. Northome/Indus. Sch. Dist. No. 363, 154 F.3d 801, 803-804 (8th Cir. 1998), the court again noted that it was applying the McDonnell Douglas standard only because the plaintiff-employee had presented no direct evidence of discrimination under either Title VII or the Equal Pay Act. In fact, however, the court in Kindred did not apply the McDonnell Douglas burden shifting analysis. Rather it determined that the plaintiff-employee had not performed work that was "equal" to the work she sought to use for comparison. Id. at 804.

9

a non-statutory salary retention policy intended to retain skilled workers and protect workers' salaries. The Army argues further that, like her two male and one female co-workers, Taylor was the beneficiary of the informal salary retention policy because she was allowed to retain her GS-7 grade and salary upon her return to a lower-salaried, GS-4 position. Further, unlike the other MIDAS workers, she received and preserved a three-grade promotion under MIDAS. The Army claims that the rationale for such a salary retention policy is to retain skilled employees during periods of time when their services are not required by preventing job loss and allowing employees to perform less demanding, lower grade work without suffering a reduction in grade or salary.

Taylor does not dispute the existence of a non-statutory salary retention policy. She argues instead that the Army raises the non-statutory policy as a mere pretext to hide gender-based wage discrimination. In support of her argument, she describes the non-statutory policy not as an informal system but as a well-structured system that requires documentation and provides a finite number of formal mechanisms for exchanging workers between departments and positions: permanent "assignments", formally documented but temporary "details" limited in duration to 120 days, and undocumented, unofficial short-term borrowing or lending of labor. She asserts that because the Army did not properly document its treatment of her co-workers in accordance with the well structured system she describes, the Army's actions were "subjective and loose" and questions of fact remain regarding whether the Army's application of its policy was inconsistent and discriminatory. In essence, she argues that sloppiness and informality in the Army's execution of its non-statutory salary retention policy necessarily supports an inference of discrimination.

Taylor also argues that, as a matter of law, an employer should not be allowed to rely on prior salary or a salary retention policy as a defense under the EPA because reliance on such factors permits the perpetuation of unequal wage structures.

10

The district court initially agreed with Taylor and denied summary judgment, specifically finding there to be a genuine question of material fact regarding whether Taylor's male coworkers were "detailed" or "assigned" to the MIDAS program. However, two days after denying summary judgment, the district court issued a second opinion in which it reversed itself. In this second opinion, the district court did not deny the existence of Taylor's factual questions regarding the mechanisms used for placement of her male coworkers (i.e., were the workers detailed, assigned, or loaned to the MIDAS program). Rather, the district court determined that, even after viewing the evidence in a light most favorable to Taylor, the outstanding questions of fact were not material because, even if resolved in favor of Taylor, they did not demonstrate a deviation from gender neutrality. The court stated, "Plaintiff argues that Mr. Early was not 'detailed' and that Defendant is grossly misrepresenting this in his briefs. I find that whether or not Mr. Early was, in fact, detailed is of little significance. Defendant still succeeds with his defense." The district court determined that, although Taylor had demonstrated informality at the Arsenal in the processing of workers' movements between positions and sloppiness in the documentation of such movements, she had not presented any evidence to rebut the Army's claims of gender neutrality in the application of its salary retention policy.

III.

We first address Taylor's general arguments that the subjective, informal nature of the Army's asserted policy necessarily gives rise to an inference of discrimination and that employers cannot rely on salary retention policies to explain unequal pay.

This court previously has rejected the general argument that subjectivity in an employment decision necessarily supports an inference of discrimination. See Elliot v. Montgomery Ward & Co., 967 F.2d 1258, 1263 (8th Cir. 1992) ("[t]hat an evaluation process contains some subjective components cannot in and of itself prove pretext or discriminatory intent"). Accordingly, if it is permissible to rely upon a

salary retention policy, the unwritten nature of the policy or the presence of subjectivity or informality in the structure or administration of the policy cannot, standing alone, support an inference of discrimination. The underlying question of whether it is permissible to rely upon a salary retention policy depends upon the meaning of the "factor other than sex" affirmative defense in the EPA. 29 U.S.C. § 206(d)(1)(iv).

On its face, the EPA does not suggest any limitations to the broad catch-all "factor other than sex" affirmative defense. The more specific factors that are enumerated – seniority systems, merit systems, and systems that measure earnings by quality or quantity of output – provide examples of the type of gender-neutral factors envisioned by the legislature. Id. The legislative history supports a broad interpretation of the catch-all exception, listing examples of exceptions and expressly noting that the catch-all provision is necessary due to the impossibility of predicting and listing each and every exception.[7] Given this facially broad exception, we are

_____

[7]See, e.g., House Comm. on Equal Pay Act of 1963, H.R. Rep. No. 309 (1963), reprinted in 1963 U.S.C.C.A.N. 687, 689:

Three specific exceptions and one broad general exception are also listed. It is the intent of this committee that any discrimination based upon any of these exceptions shall be exempted from the operation of this statute. As it is impossible to list each and every exception, the broad general exclusion has also been included. Thus, among other things, shift differentials, restrictions on or differences based on time of day worked, hours of work, lifting or moving heavy objects, differences based on experience, training, or ability would also be excluded. It also recognizes certain special circumstances, such as "red circle rates." This term is borrowed from War Labor Board parlance and describes certain unusual, higher than normal wages rates which are maintained for many valid reasons. *For instance, it is not uncommon for an employer who must reduce help in a skilled job to transfer employees to other less demanding jobs but to continue to pay them a premium rate in order to*

reluctant to establish any per se limitations to the "factor other than sex" exception by carving out specific, non-gender-based factors for exclusion from the exception.

While we recognize that salary retention policies might lead to wage decisions based on factors unrelated to an individual's qualifications for a particular job, such policies are not necessarily gender biased. As discussed in footnote 7, the relevant legislative history recognizes that salary retention policies may serve legitimate, gender-neutral business purposes, such as the retention of skilled workers who may be needed in the future to perform higher level work. The Army has raised this rationale and, in fact, Thornton, Early, and Taylor were spared from the surplus roster due to their placement with the MIDAS program. The undisputed evidence demonstrates that Thornton, Early, Taylor, and Jones were retained as employees at the Arsenal and all four returned to positions graded at or above their prior salary grades following their placements with the MIDAS program.

Further, although we recognize that an employer might apply a salary retention policy in a discriminatory fashion or use such a policy as a vehicle to perpetuate historically unequal wages caused by past discrimination, these potential abuses do not provide valid bases to adopt a per se rule that declares all salary retention practices inherently discriminatory. Rather, these risks simply highlight the need to carefully examine the record in cases where prior salary or salary retention policies are asserted as defenses to claims of unequal pay. In particular, it is important to ensure that employers do not rely on the prohibited "market force theory" to justify lower wages for female employees simply because the market might bear such wages. See Corning Glass Works v. Brennan, 417 U.S. 188, 205 (holding that, although women may have been willing to work for lower wages than men and market forces therefore dictated that an employer could pay women less than men,

_____

*have them available when they are again needed for their former jobs.*
(Emphasis added).

13

reliance on such a market force theory "nevertheless became illegal once Congress enacted into law the principle of equal pay for equal work."). In addition it is important to ensure that reliance on past salary is not simply a means to perpetuate historically lower wages. Kouba v. Allstate Ins. Co., 691 F.2d 873, 876 (9th Cir. 1982) (stating that "a factor like prior salary . . . can easily be used to capitalize on the unfairly low salaries historically paid to women").

In conducting this examination, our concern is not related to the wisdom or reasonableness of the asserted defense. It is related solely to the issue of whether the asserted defense is based on a "factor other than sex." 29 U.S.C. § 206(d)(1)(iv). We "'do not sit as a super-personnel department that re-examines an entity's business decisions.'" Kipp v. Mo. Highway and Trans. Comm'n., 280 F.3d 893, 898 (8th Cir. 2002). As such we are reluctant to establish a per se rule that might chill the legitimate use of gender-neutral policies and practices. In this regard, we reach the same conclusion as the Seventh Circuit which refused to adopt a per se rule that would exclude salary retention or past salary as qualifying "factors other than sex." Covington v. Southern Illinois Univ., 816 F.2d 317, 322-323 (7th Cir. 1987).

In Covington, the Seventh Circuit determined that a university's salary retention policy, differences in education, and differences in experience were all qualifying factors other than sex under 29 U.S.C. § 206(d)(1)(iv). The Covington court stated:

> We conclude that SIU's salary retention policy qualifies as a factor other than sex. We do not believe that the EPA precludes an employer from implementing a policy aimed at improving employee morale when there is no evidence that that policy is either discriminatorily applied or has a discriminatory effect. Although we realize that a plaintiff need not establish discriminatory intent to recover under the EPA, we do not believe that the Act precludes an employer from carrying out a policy which, although not based on employee performance, has in no way been shown to undermine the goals of the EPA.

14

Id. at 322.  Similarly, the Ninth Circuit has held that, "the Equal Pay Act does not impose a strict prohibition against the use of prior salary."  Kouba, 691 F.2d at 878.

In Kouba, the Ninth Circuit found that the per se rejection of reliance on prior salary as a factor other than sex would be inconsistent with Congress's decision to adopt a broad, catch-all affirmative defense.  However, the court in Kouba ultimately remanded the case to the district court to determine whether the employer's consideration of past salary was reasonable.  The court stated, "[a] pragmatic standard, which protects against abuse yet accommodates employer discretion, is that the employer must use the factor reasonably in light of the employer's stated purpose as well as its other practices."  Id. at 876-77.  Therefore although the court in Kouba refused to adopt a bright line rule against reliance on salary retention or past salary as factors other than sex, it was willing to sit in review of the employer's decisions.  This "reasonableness" level of review is greater than that provided in the Seventh Circuit and greater than that which we believe to be required under Title VII and the EPA.  As noted above, we do not sit as a "super personnel department" and we do not review the wisdom of an employer's chosen means to accomplish its goals.  Like Kouba, we believe a careful review of the record is required.  However, we would limit that review to a search for evidence that contradicts an employer's claims of gender-neutrality.

In contrast to Covington and Kouba, the Eleventh Circuit in Glenn v. General Motors Corp., 841 F.2d 1567, 1570 (11th Cir. 1988) did state a bright line prohibition against reliance on prior salary except in limited, exigent circumstances.  In Glenn, the pay discrepancy arose from a facially non-discriminatory policy purportedly intended to promote the switch of hourly employees to salaried positions.  Under the policy, General Motors guaranteed hourly employees that they would not suffer a drop in pay if they would switch from hourly to salaried positions.  As a result of the policy, some male employees who switched to salaried positions received higher

15

wages than newly hired, female salaried employees and female salaried employees who had not switched from hourly positions. The court in Glenn rejected GM's policy as an affirmative defense stating that GM was attempting to rely on a "market force theory", i.e., a theory based on the belief that labor market supply and demand dictates that women may be paid less than men. Glenn, 841 F.2d at 1570 (citing Corning Glass Works, 417 U.S. at 205).

The Glenn court found further support for its position by adopting a limited reading of the legislative history that we quote above at Note 7. House Comm. on Equal Pay Act of 1963, H.R. Rep. No. 309, reprinted in 1963 U.S. Code Cong. & Admin. News 687, 689 ("For instance, it is not uncommon for an employer who must reduce help in a skilled job to transfer employees to other less demanding jobs but to continue to pay them a premium rate in order to have them available when they are again needed for their former jobs."). Glenn interpreted the reference to the retention of skilled workers as *only* applying in special exigent circumstances. Glenn, 841 F.2d at 1571 ("The legislative history thus indicates that the 'factor other than sex' exception applies when the disparity results from unique characteristics of the same job; from an individual's experience, training, or ability; *or from special exigent circumstances connected with the business.*") (emphasis added). Therefore, while falling short of an outright prohibition on the consideration of prior salary, Glenn established a rule that would reject reliance on prior salary (or any other factor unrelated to a particular applicant's qualifications or a particular job's requirements) except in situations where the employer demonstrates that the pay discrepancy was required by a business exigency.

We do not adopt the Glenn court's narrow reading of the EPA's legislative history. Rather, we believe a case-by case analysis of reliance on prior salary or salary retention policies with careful attention to alleged gender-based practices preserves the business freedoms Congress intended to protect when it adopted the catch-all "factor other than sex" affirmative defense. To conduct a reasonableness

16

inquiry into the actions of the employer or to limit the application of a salary retention policy to only exigent circumstances would, we believe, unnecessarily narrow the meaning of the phrase "factor other than sex." Accordingly, we reject Taylor's argument that a salary retention policy cannot serve as a factor other than sex. Having done so, we must examine the record and the alleged questions of fact surrounding the Army's asserted defense.

## IV.

Our review of the record leads to the conclusion that the outstanding issues of fact raised by Taylor are immaterial and that summary judgment is appropriate. Evans, the position classification specialist with the Arsenal, stated in her declaration:

> When we lose funding which impacts the jobs being performed, we do our best to ensure that employees have another job at the Arsenal and do not suffer a pay cut. When the only positions open are at a lower pay grade, we frequently detail these employees to these positions so that their pay is not reduced and so they can remain gainfully employed.

Appellant's App. at 40. Evan's representation summarizes the Army's affirmative defense. The Army claims that more highly paid employees may be informally placed in less demanding, lower salaried positions while retaining their higher salaries *and* that such downward placements may occur without documentation and without time limitations on the placements. Examining the Army's treatment of employees in this case, this non-statutory salary retention policy is consistent with the undisputed evidence and with the Army's claims of gender neutrality. Taylor, Early, Thornton, and Jones – the male and female MIDAS workers – all retained their salaries when placed in the MIDAS program and maintained their salaries upon transfer from the program. The Army's described policy was applied to preserve their employment

17

status (placement in the MIDAS program rather than exposure to the risks of being named on the surplus roster) to preserve their salaries, and, in the case of Taylor, to preserve her promotion.

That having been said, a careful review of the record and consideration of the reasonable inferences supported by the record do reveal uncertainty regarding application of the Army's non-statutory salary retention policy. However, this uncertainty does not "attain the dignity of substantial evidence" and rather is "such as merely to create a suspicion." Metge, 762 F.2d at 625.

Evans and other witnesses who were deposed or who testified at the EEOC hearing conceded that the Army did, in fact, have a structured, non-statutory salary retention policy. Under this policy, the term "detail" was a technical term of art defined as an out-of-grade placement that did not impact grade or salary and that was not to exceed 120 days. A detail was a personnel action that required documentation and differed from a permanent assignment or an informal, short term exchange of borrowed labor between departments or positions. Evans explained that the purpose for documenting and limiting the duration of details to 120 days was to ensure that the placement of lower grade workers in higher grade positions (upward details) occurred through advertised competitive processes that afforded advancement opportunities to lower grade employees (rather than through "details" of extended duration that necessarily would result in a noncompetitive process of appointments without advertisement).

Consistent with this explanation, Evans stated that the Department of the Army, at some time during 1994, sent a memo instructing that, because of downsizing and an inability to process paperwork, documentation and time limits were no longer required for details involving the placement of higher-grade workers in lower-grade positions (downward details). As Evans explained, there were no competitive concerns at issue with downward details so the justification for time limits did not

18

apply.[8]  Finally, the Army presented evidence of other workers similarly placed in lower grade positions.[9]

[8]Evans testified as follows:

> The primary purpose that you would want to watch for a detail would be that you're not detailing someone to higher graded positions, and that you're limited by only being able to detail them for a hundred and twenty (120) days, non-competitively.  If it's to the same grade or to a lower grade, there's no advantage to the employee or to management other than documenting that.  Now, then, the CPOC, that's the South Central Region, has discouraged our even processing formal details because of their downsizing, for two (2) reasons: one, because they downsized; they really don't have the staff.  If it's not going to affect the pay, why do it?  So, they've asked us, unless we just absolutely think we need to, don't do a detail because they don't have the staff, and they're servicing 36,000 employees; and, number two, there are interface problems between the Personnel Data System and the Payroll Data System, so in order to cut down any possible glitches that could occur between those systems, we try not to process any paperwork unless it's necessary.

> EEOC hearing transcript, 122-23.

[9]Evans further testified:

> Q.  And then what was the nature of their – and I hate to use the word, detail, but what was the nature of their assignment to a lower grade? Can you explain why that was done and what the result was?

> A.  I guess just to document that they were doing those duties.  I mean, it's to no advantage to them or disadvantage to them because details are frequently used throughout the Arsenal; and, in fact, a lot of times we have a lot of people on what we call loaned and borrowed labor, where there is no detail done at all, no

19

Taylor argues that Evans' explanation is contradicted by the Army's actions in this case. Specifically, she notes that approximately 16 months after Early was placed in the MIDAS program, he was "officially" detailed to the GS-7 position. According to Taylor, the official detail occurred when his placement was documented as a detail. She argues that the documenting of this detail and the imposition of a 120 day limit would not have been necessary under the informal salary retention policy claimed by the Army. Taylor also argues that the Army's after-the-fact compliance with the documentation and post-hoc imposition of a time-limit requirement belie the sincerity of its defense and create a question of fact regarding whether or not Early was actually detailed.

---

documentation whatsoever.

Q. Are there some members of the Arsenal, even today, who have been quote, detailed, and I'm saying they're working at another lower grade?

A. There are –

Q. Can you give me some examples?

A. There are many people on this Arsenal who are not even detailed at all, and there are at least nine (9) people on the Arsenal currently that are officially detailed. But, for example, we have about four (4) employees, let's see, Lock Burns, Carolyn DeVoss, and Paulette Christy, who are on another, doing totally different jobs than what their original function is, and it hasn't affected their pay; but they're working on the MEO because of the A-76 of ours being contracted out. Myself, along with may other employees several years ago were on a reorganization team, none of us were detailed, but our duties totally changed.

E.E.O.C. Hearing Transcript at 124-25.

20

In addition, Taylor attacks the timing and manner in which the Army formally processed Early's change in status. The documentation surrounding Early's change in status indicates that the official documentation of his detail was requested in November 1995, after Taylor's meetings with the EEOC Officer and Bacon, and over nine months after Early's placement with MIDAS. The request was not acted upon until May 1996. Bacon's signature approving the request is undated and the change in status did not become effective until May 12, after Bacon's receipt of Taylor's follow-up memo. However, there is no dispute surrounding the fact that Early had, since the commencement of MIDAS work under the Directorate of Product Assurance, performed work as a MIDAS program worker. The post-hoc documentation of this fact, while arguably suspicious, did nothing to alter his status, duties, or pay in any manner.

While the Army's actions concerning the documentation of Early's status following Taylor's initial voicing of a grievance may be suspicious, we cannot find that these actions rise above the level of being merely suspicious. Even when properly viewed in a light most favorable to Taylor, there is no basis upon which to infer a departure from gender neutrality. We believe the district court correctly determined that the technical details concerning the processing of the MIDAS employees are immaterial. Even if a finder of fact were to focus on the Army's actions concerning the after-the-fact documentation of Early's status and the timing of these actions, no reasonable finder of fact could reject the undisputed evidence concerning the actual treatment of the employees in this case and the benefits received by these employees. In short, we agree with the district court that Taylor, as the non-moving party, failed to present evidence "such that a reasonable jury could find a verdict" in her favor. Anderson, 477 U.S. at 248.

The judgment of the district court is affirmed.

21

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.