BP PRODUCTS NORTH AMERICA
INC., Plaintiff,

v.

TWIN CITIES STORES,
INC., Defendant.

Case No. 04–CV–2957 (PJS/JJG).

United States District Court,
D. Minnesota.

Nov. 13, 2007.

Michael S. Ryan and Christopher J. Willey, Murnane Brandt, PA, for plaintiff.

Brian S. McCool, John M. Koneck, and S. Jamal Faleel, Fredrikson & Byron, PA, for defendant.

## ORDER

PATRICK J. SCHILTZ, District Judge.

This matter is before the Court on the motion of plaintiff BP Products North America Inc. ("BP") for summary judgment on the pricing counterclaim of defendant Twin Cities Stores, Inc. ("TCS"). For the reasons set forth below, BP's motion is granted, and TCS's pricing counterclaim is dismissed with prejudice.

## I. BACKGROUND

TCS owns and operates gas stations and convenience stores throughout the Twin Cities metropolitan area. In 1998, TCS and BP[1] entered into a series of agreements, including a Master Commission Marketer Agreement ("MCMA"). Faleel Aff. Ex. A, Apr. 13, 2007. Under the MCMA, TCS agreed to permit BP to sell its gasoline at fifty-eight TCS stores, and BP agreed to pay TCS a commission on each gallon of gasoline sold. MCMA ¶¶ 2(a), 10(a). The MCMA ran from 1998 to 2005.

The MCMA gave BP the right to "establish the retail price" of gasoline at the participating TCS stores. MCMA ¶ 2(a). Nothing in the MCMA limited BP's price-setting discretion in any way. Undeterred by that fact, TCS has sued BP for allegedly breaching the MCMA in the way that BP exercised its discretion to set retail gasoline prices. Specifically, TCS alleges that, from April 2004 to May 2005, BP priced its gasoline well above market lev-

---

1. Actually, it was BP's predecessor—Amoco Oil Company—that entered into the agreements with TCS. For the sake of simplicity, the Court will refer to BP and Amoco collectively as "BP."

els. According to TCS, this caused fewer customers to buy gasoline at TCS stores—and, as a result, TCS sold fewer newspapers, beverages, snacks, and other products. TCS seeks to recover commissions lost on gasoline sales and profits lost on sales of other products.

TCS's sole support for its broad "pricing counterclaim" is the report of expert witness Gary Greene. On June 1, 2007, 2007 WL 4585385, however, this Court granted BP's motion to exclude Greene's report and bar him from testifying at trial. Docket No. 185. The Court found that, for several reasons, Greene's opinions were not admissible under Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court's ruling left TCS with no admissible evidence that BP priced gasoline at noncompetitive levels from April 2004 to May 2005.

Deprived of Greene's testimony, TCS has retreated to a much more limited claim. TCS now argues that BP violated the MCMA in April 2004 when BP admittedly implemented, and then quickly abandoned, a new pricing strategy under which BP priced its gasoline slightly higher than the competition. Both Patrick Saunders, a BP regional sales manager, and Michael Proud, a BP pricing analyst, testified that BP decided in April 2004 to price gasoline at each of its "commission market" sites[2] two cents above each site's "key competitor." Proud Dep. 110; Saunders Dep. 64–65. BP abandoned this strategy after two to four weeks. Proud Dep. 115 (month); Saunders Dep. 64 (two weeks). BP then returned to its previous pricing practices.[3] Proud Dep. 117; Saunders Dep. 65. TCS now argues that, in pricing its gasoline two cents per gallon higher than the competition for a few weeks in 2004, BP breached the MCMA and is liable to TCS for damages.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over a fact is genuine only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir.2006). In considering a motion for summary judgment, a court must assume that the nonmoving party's evidence is true and must draw all justifiable inferences arising from the evidence in that party's favor. *Taylor v. White*, 321 F.3d 710, 715 (8th Cir.2003).

### B. TCS's Pricing Counterclaim

As noted, the MCMA explicitly gives BP the right to "establish the retail price" of

---

2. A "commission market" site is a site at which the owner has agreed to permit BP to sell its gasoline, and BP has agreed to pay the owner a commission on every gallon of gasoline sold. The fifty-eight TCS stores covered by the MCMA are "commission market" sites.

3. At oral argument, TCS contended that Patrick Saunders testified that after BP abandoned its overall two-cent strategy, it continued to try to stay two cents above the market in particular stores. Hr'g Tr. 53, June 1, 2007 [Docket No. 186]. Saunders said no such thing. Both Saunders and Proud testified that, after trying the two-cent pricing strategy for a short period, BP went back to its previous pricing practices. Saunders Dep. 65; Proud Dep. 117.

gasoline sold at participating TCS stores, MCMA ¶ 2(a), and nothing in the MCMA explicitly limits that authority in any way. Thus, on first glance, it is difficult to understand how BP's decisions about gasoline prices could violate the MCMA. TCS nonetheless argues that BP's two-cent pricing strategy breached the MCMA in two ways. First, TCS argues that BP's pricing practices breached ¶ 7 of the MCMA—a paragraph that, on its face, has nothing to do with gasoline pricing. Second, TCS contends that BP's short-term pricing experiment breached the implied covenant of good faith and fair dealing. The Court considers each of these claims in turn.

### 1. Paragraph 7 of the MCMA

Paragraph 7 of the MCMA provides:

7. BUSINESS OPERATIONS. Twin Cities will not conduct any business operations at any Participating Fuel Facility or Participating C–Store that, in [BP]'s sole discretion, may reflect poorly on [BP]'s name or business reputation or may offend an appreciable segment of the public. Likewise, [BP] will not conduct itself at any Participating Fuel Facility in a manner that, in Twin Cities' sole discretion, may reflect poorly on Twin Cities' name or business reputation or may offend an appreciable segment of the public. In addition to the terms of this Agreement, Twin Cities agrees to specifically adhere to [BP]'s policies, practices, procedures, programs and standards regarding: (i) delivery, receipt and sale of motor fuel; (ii) repair and maintenance of the Aboveground Fuel Facility Improvements; (iii) motor fuel inventory measuring and monitoring; (iv) retail image, appearance and cleanliness; (v) remittance to [BP;] (vi) safety and security; (vii) employee behavior, customer service and customer interaction; (viii) acceptance of credit cards; and (ix) proper execution of any and all motor fuel promotion activities developed by [BP], including the proper display of point-of-purchase materials.

TCS argues that, when BP priced its gasoline two cents higher than the competition for two to four weeks, BP breached its promise to "not conduct itself at any [TCS store] in a manner that, in Twin Cities' sole discretion, may reflect poorly on Twin Cities' name or business reputation or may offend an appreciable segment of the public." In other words, TCS argues that ¶ 7 was intended to act as a check on BP's authority under the MCMA to set gasoline prices. In support of its argument, TCS relies heavily on extrinsic evidence of ¶ 7's meaning.

In Minnesota, a court asked to interpret a written contract must first determine if the contract is ambiguous. *Travertine Corp. v. Lexington–Silverwood,* 683 N.W.2d 267, 271 (Minn.2004). An unambiguous contract must be given its plain and ordinary meaning; that meaning is deemed to be conclusive evidence of the parties' intent. *State ex rel. Humphrey v. Philip Morris USA, Inc.,* 713 N.W.2d 350, 355 (Minn.2006); *Knudsen v. Transport Leasing/Contract, Inc.,* 672 N.W.2d 221, 223 (Minn.Ct.App.2003). Only if the contract is ambiguous will the court go beyond the four corners of the document and examine extrinsic evidence of the parties' intent. *Hous. & Redev. Auth. of Chisholm v. Norman,* 696 N.W.2d 329, 337 (Minn. 2005). A written contract is ambiguous only if its language is reasonably susceptible of more than one interpretation. *Denelsbeck v. Wells Fargo & Co.,* 666 N.W.2d 339, 346 (Minn.2003). In deciding whether a contract is ambiguous, a court must consider only the contract's language (and not extrinsic evidence), read the contract as a whole, and, if possible, reject any interpretation that would render a provision of the

contract meaningless. *Chergosky v. Crosstown Bell, Inc.,* 463 N.W.2d 522, 525–26 (Minn.1990).

 When interpreted in light of these principles, the MCMA in general—and ¶ 7 in particular—cannot plausibly be interpreted as placing limits on BP's authority to set gasoline prices. To begin with, ¶ 7 says not a word about gasoline prices. It instead places restrictions on the way that BP "conduct[s] itself at any Participating Fuel Facility"—i.e., on the way that BP employees or agents *behave* while they are *present* at TCS stores. It is difficult to characterize pricing decisions made at faraway BP offices by pricing analysts who may never have set foot on the premises of a TCS store as the "conduct" of a BP employee "at" a TCS store.

Moreover, ¶ 7 is obviously a morals clause. Its focus is not on pricing and economic competitiveness, but on the manner in which BP agents conduct themselves while they are at TCS stores among TCS customers. Under the MCMA, BP has extensive rights to enter onto TCS property. BP is responsible for delivering gasoline to TCS stores, MCMA ¶ 2(a)(i), and BP also has the right to construct, inspect, and remove fuel pumps at TCS stores, inspect the premises of TCS stores, and audit TCS's books, MCMA ¶¶ 5(a), 12, 18. Paragraph 7 simply ensures that, while BP agents are present at TCS stores working among TCS customers, they do not behave in a manner that "may reflect poorly on Twin Cities' name or business reputation or may offend an appreciable segment of the public." Clearly, the clause is aimed at such conduct as using profanity, dressing inappropriately, acting rudely, or otherwise behaving in a manner that might "offend" TCS customers.

TCS's reading of ¶ 7 is not only implausible in isolation, it is implausible in the context of the contract as a whole. The MCMA explicitly gives BP the right to "establish the retail price" of gasoline at participating TCS stores. MCMA ¶ 2(a). Even though many clauses in the MCMA require one party or the other to act "reasonably" in some respect,[4] BP is not required to act reasonably in setting gasoline prices or to set gasoline prices within a certain range (e.g., within three cents of a particular competitor or a particular benchmark). Presumably the parties realized that the market would provide all of the constraints needed on BP's discretion. After all, if BP's pricing drives off customers, it is not only TCS and other commission market sites that lose money, but BP itself.

Against this backdrop, ¶ 7 cannot be read to impose restraints on BP's pricing of gasoline. As already discussed, ¶ 7 is a morals clause governing the conduct of BP agents on TCS premises. The clause does not even *mention* the pricing of gasoline, nor does it provide any workable standard for determining when BP's pricing of gasoline harms TCS's "name" or "offends" the general public. More importantly, ¶ 7 gives TCS the "sole discretion" to determine what conduct "reflect[s] poorly on [its] name or business reputation or may offend an appreciable segment of the public." Therefore, under TCS's reading of the MCMA, it would be TCS, and not BP, that would (as a practical matter) have the "sole discretion" to determine gasoline prices. It simply makes no sense that the

---

4. *See, e.g.,* MCMA ¶ 5(a) (modifications to existing fuel facilities are subject to the parties' approval, which "will not be unreasonably withheld"); *id.* ¶ 8 (TCS will designate a key management person "subject to [BP]'s approval reasonably exercised"); ¶ 18(a) (TCS "will use reasonable commercial efforts" to maintain underground storage tanks); ¶ 28(a) (requiring BP's approval of any sale of TCS's business operations, which "will not be unreasonably withheld or delayed").

parties, after agreeing that BP would have the right to "establish the retail price" of gasoline, would then take away virtually all of that discretion through a clause that says nothing about gasoline pricing and that is located nowhere near the clause that gives BP the sole authority to set gasoline prices. For these reasons, the Court holds, as a matter of law, that ¶ 7 sets no limit on BP's discretion to determine the price of gasoline, and that BP's pricing practices therefore did not breach ¶ 7.

■ Even if TCS's reading of ¶ 7 were plausible, TCS's pricing counterclaim would fail because TCS has not offered any evidence that BP's decision to price gasoline at two cents above market for two to four weeks in fact "reflect[ed] poorly on Twin Cities' name or business reputation or . . . offend[ed] an appreciable segment of the public." TCS points to evidence that it experienced a significant drop in gasoline sales after April 2004, when BP implemented its two-cent pricing strategy. TCS also cites the testimony of BP's pricing manager, Steven George, in which George (who was unaware of the two-cent pricing strategy) stated that such a strategy made no sense and that he never would have approved it. George Dep. 346. Finally, TCS offers evidence that its sister company, Twin Cities Avanti Stores LLC ("Avanti"), which also operates gasoline stations in the Twin Cities, did not experience a similar drop in sales.

The problem with TCS's evidence is that none of it explains *why* TCS experienced a drop in sales volume from April 2004 to May 2005. TCS lines up the beginning of this period—April 2004—with the start of BP's two-cent pricing strategy, and contends that the latter caused the former. But evidence of a temporal correlation is not the same as evidence of causation. TCS's theory also makes no sense. According to TCS, gasoline customers are so exquisitely sensitive to pricing that they instantly switched their business away from TCS stores based on a two-cent difference in price. And yet, according to TCS, after BP once again priced its gasoline competitively, these same customers failed to switch back to TCS stores.

It would be pure speculation to conclude that the drop in sales volume for a *year* was caused by BP pricing the gasoline sold at TCS stores at two pennies per gallon higher than the competition for a period of *four weeks*. And the comparison to TCS's sister company does not remedy this problem. TCS contends that "TCS and [Avanti] had essentially the same management and were operated in virtually the same manner, with the only exception being that [Avanti] management, and not BP, was pricing the gasoline at [Avanti's] facilities." *See* Docket No. 169 at 7. Putting aside the fact that TCS has provided no admissible evidence that this is true, a factfinder would need a great deal more information about the Avanti stores in order to draw the conclusion urged by TCS. TCS and Avanti stores are scattered throughout a large geographical area, and thus function in different markets with different conditions. Yet TCS provides no information about the market conditions of any particular TCS or Avanti store, much less any (admissible) expert opinion ascribing changes in gasoline sales at one store solely to the pricing of its gasoline.

Finally, whether BP's pricing manager considered the two-cent pricing strategy a good experiment or a bad experiment is irrelevant to the question whether the experiment "reflect[ed] poorly on Twin Cities' name or business reputation or . . . offend[ed] an appreciable segment of the public." George testified that the pricing strategy would reduce sales while it lasted, but he did not testify that it would have a long-term impact on TCS's name or repu-

tation. Anyone can drive around the Twin Cities area on any given day and observe some gasoline stations charging more for gasoline than others—just as anyone can observe some grocery stores and pizza parlors and dry cleaners and shoeshine stands charging more than others. It is hard to believe that minor, short-term pricing differences damage the reputation of businesses or offend many members of the public; if they did, there would not be a business in existence whose reputation had not been damaged.

At bottom, TCS has submitted no evidence that BP's short-lived two-cent pricing experiment damaged the reputation of TCS or offended the public. Without such evidence, its counterclaim must fail to the extent that it is based on an alleged breach of ¶ 7 of the MCMA.

### 2. Implied Covenant of Good Faith and Fair Dealing

TCS also argues that BP's conduct breached the implied covenant of good faith and fair dealing. TCS and BP agree that, if there is no express contractual provision limiting BP's authority to set gasoline prices (as the Court has found), then the implied covenant of good faith and fair dealing acts as a check on BP's discretion. Hr'g Tr. 72, June 1, 2007 [Docket No. 186] ("Hr'g Tr."). The parties strongly disagree, though, on what is required of BP under the good-faith covenant.

TCS argues that, under Minnesota law, every party to a contract is required by the good-faith covenant to act "reasonably." According to TCS, then, BP breached the MCMA whenever it set an unreasonable gasoline price, no matter what BP's motives, and no matter what the impact on TCS. BP counters that, under Minnesota law, the good-faith covenant is violated only when a party acts maliciously, and then only when one party makes it impossible for another party to perform

under the contract. According to BP, then, BP can be held liable only if it acted with ill will and its conduct made it impossible for TCS to perform under the MCMA.

This Court has clearly rejected the notion that the implied covenant of good faith and fair dealing is breached only when one party to a contract makes it impossible for another party to perform. *See White Stone Partners, LP v. Piper Jaffray Cos.,* 978 F.Supp. 878, 881 n. 2, 884–85 (D.Minn.1997) (rejecting the "impossibility of performance" standard). Unfortunately, on the other question—that is, the question of whether conduct that is merely unreasonable can violate the covenant—Minnesota courts (and federal courts applying Minnesota law) have not been entirely clear or consistent. As is discussed below, though, the substantial weight of authority is that the covenant is breached only by conduct that is dishonest or malicious or otherwise in subjective bad faith.

That is not surprising. Countless contracts give one party the discretion to control some aspect of the parties' relationship. The implied covenant of good faith and fair dealing prevents the party with control from abusing its discretion in a manner that would inflict harm on the vulnerable party and undermine the purpose of the contract. In exercising discretion under a contract, a party must use "faith" that is "good." This speaks not of objective reasonableness, but of subjective motivation.

Reading into the implied covenant a duty to act with objective reasonableness—or, put differently, holding that the implied covenant can be breached by good-faith mistakes—would require courts to litigate a huge number of contractual disputes under tort-like standards. It would also render superfluous any explicit lan-

guage in a contract requiring parties to act "reasonably" in one respect or another. These clauses—which appear in the MCMA and in countless other contracts—would serve no purpose if every party to every contract was already obligated to act with objective reasonableness.

■ Consistent with this analysis, Minnesota courts generally look to the defendant's motive to determine whether the defendant has breached the implied covenant of good faith and fair dealing. For example, in *White Stone Partners,* the parties entered into a financing agreement for a trailer park, subject to an acceptable environmental appraisal of the park. 978 F.Supp. at 879–80. Although the parties obtained an appraisal that found no problems with the trailer park, the defendant nevertheless terminated the financing agreement, claiming that it was not satisfied with the results of the (favorable) appraisal. *Id.* at 880. The plaintiff contended that the defendant's purported dissatisfaction with the appraisal was feigned, and that the defendant's true motive was that the deal was no longer economically attractive. *Id.* Based on these allegations, the court held that the plaintiff had stated a viable cause of action for breach of the implied duty of good faith. *Id.* at 885. In so holding, the court explained that the duty of good faith requires only that a party granted discretion under a contract act honestly in exercising its discretion, and that a party cannot be liable for a decision simply because it is unreasonable. *See id.* at 882–84.

Minnesota courts have generally applied this same standard in subsequent good-faith cases. *See, e.g., Minnwest Bank Cent. v. Flagship Props. LLC,* 689 N.W.2d 295 (Minn.Ct.App.2004) ("To establish a violation of this covenant, a party must establish bad faith by demonstrating that the adverse party has an ulterior motive for its refusal to perform a contractual duty."); *Prairie Island Indian Cmty. v. Minn. Dep't of Pub. Safety,* 658 N.W.2d 876 (Minn.Ct.App.2003) ("as long as the State's action was done honestly, the State has not breached the covenant of good faith and fair dealing"); *Sterling Capital Advisors, Inc. v. Herzog,* 575 N.W.2d 121, 125 (Minn.Ct.App.1998) (" 'Bad faith' is defined as a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties"); *LeMond Cycling, Inc. v. PTI Holding, Inc.,* No. 03–5441, 2005 WL 102969, at *7 (D.Minn. Jan. 14, 2005) ("Good faith requires a party to act honestly, whether negligently or not"); *cf. United States v. Basin Elec. Power Coop.,* 248 F.3d 781, 796 (8th Cir.2001) ("[Under the federal common law of contracts,] [t]he good faith covenant does not impose a general requirement that a party act reasonably. Rather, the covenant acts merely as a gap filler to deal with circumstances not contemplated by the parties at the time of contracting.").

That said, TCS is correct that there is language in some cases that, when read in isolation, seems to suggest that the implied covenant of good faith and fair dealing can be breached by conduct that is merely unreasonable. *See, e.g., Team Nursing Servs., Inc. v. Evangelical Lutheran Good Samaritan Soc'y,* 433 F.3d 637 (8th Cir. 2006); *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.,* 450 F.3d 816 (8th Cir.2006); *Alcorn v. BP Prods. N. Am. Inc.,* No. 04–0120, 2004 WL 1745761 (D.Minn. Aug. 2, 2004). Read carefully, though, these cases are not as broad as TCS argues.

In both *Team Nursing* and *Baer,* the Eighth Circuit affirmed the dismissal of the plaintiffs' breach-of-good-faith claims on the ground that the defendants had acted in an objectively reasonable manner. *Team Nursing,* 433 F.3d at 642; *Baer,* 450

F.3d at 822 n. 2. But in neither case was there any evidence that the defendants had acted dishonestly or maliciously. Obviously, when a party acts *neither* unreasonably *nor* in bad faith, there is no breach of the implied covenant. But that does not mean that, to escape liability, a party must act *both* reasonably *and* with pure motives. The language of *Team Nursing* is admittedly broad, but in neither *Team Nursing* nor *Baer* did the court have to decide whether a party who had acted unreasonably, but in good faith, had breached the implied covenant. Thus, any language in these cases suggesting that one can act in good faith and yet still breach the good-faith covenant is dicta that cannot be considered authoritative in light of the substantial Minnesota case law to the contrary.

As for *Alcorn*, that case involved allegations that BP charged the plaintiff gas stations more for gasoline than it charged its company-owned stores. *Alcorn*, 2004 WL 1745761, at *1. In a one-paragraph denial of BP's motion to dismiss the plaintiffs' bad-faith claims, the court stated that "BP ... is not free to set a price that is unreasonable or is otherwise not a good faith price." *Id.* at *2. On its face, this language suggests that the good-faith covenant can be breached by conduct that is merely unreasonable. But this language should not be given much weight. First, it appeared in a single paragraph, without explanation or elaboration. Second, it appeared in an order that denied a motion to dismiss—that is, in an order that was not appealable, and thus did not have to explain or elaborate to the same extent as an appealable order. And finally, the "unreasonable" conduct alleged in *Alcorn* was necessarily malicious conduct. A gasoline supplier does not accidentally or negligently charge competitors more for its gasoline than it charges its own stations.

A comparison with this case is instructive. In this case, BP is alleged to have embarked on a pricing strategy that was *dumb*—a pricing strategy that BP quickly abandoned. There is no hint in the record that the pricing strategy was aimed at anyone or anything—no evidence, for example, that BP meant to put TCS at a competitive disadvantage or retaliate against TCS for some slight. Rather, the record suggests that BP was simply trying to set its prices in a way that would maximize its profits. That's what businesses do. In *Alcorn*, by contrast, BP was accused of *targeting* the competitors of its stores and trying to put them at a competitive disadvantage. In assessing BP's conduct, the jury would not have inquired into what a hypothetical reasonable gasoline supplier would have done under the same circumstances; rather, the jury would have inquired into BP's subjective motives. Thus, the statement in *Alcorn* was dicta because BP was not alleged to have acted unreasonably but in good faith.

Under these circumstances, it seems hard to believe that *Alcorn* intended to hold—without even citing, much less distinguishing, the many Minnesota cases to the contrary—that a party can breach the implied covenant of good faith by making a good-faith error. This conclusion is bolstered by the fact that *Alcorn* cited *White Stone Partners*, which clearly holds that, although a party to a contract must exercise its discretion honestly, it need not necessarily exercise it reasonably. In sum, *Team Nursing, Baer*, and *Alcorn* cannot be read as broadly as TCS suggests.

■ The Court therefore concludes that, because the express terms of the MCMA give BP the authority to set gasoline prices, and because nothing in the MCMA limited BP's authority in any manner, BP's decisions about the price of its

gasoline could give rise to liability only if those decisions breached the implied covenant of good faith and fair dealing. The Court further concludes that BP's pricing decisions could not breach the implied covenant of good faith and fair dealing—even if they were objectively unreasonable—unless those decisions were made dishonestly, maliciously, or otherwise in subjective bad faith. As TCS conceded at oral argument, there is no evidence that BP acted for any improper purpose. Hr'g Tr. 55–56. Thus, there is no evidence from which a jury could find that BP violated the implied covenant of good faith and fair dealing.

Even if TCS were correct that BP could violate the implied covenant by acting unreasonably (but in good faith) in setting gasoline prices, there is no evidence from which a jury could conclude that BP's conduct was, in fact, unreasonable. The Court rejects TCS's assertion that BP could violate its duty of good faith merely by having the highest gasoline prices on a particular day. And the Court rejects as preposterous the suggestion of TCS's expert witness that BP acted unreasonably—and thus breached the MCMA—any time that its gasoline was not the *lowest* priced gasoline on the market. *See* Hr'g Tr. 6. Given the normal ebb and flow of the market—in which gasoline prices vary from locale to locale, store to store, day to day, and even hour to hour—TCS must prove something more than that BP did not always have the lowest price—or once in a while had the highest price—in order to prove that BP acted unreasonably.

The only evidence that BP ever set its prices higher than the market for any sustained length of time is the evidence of BP's short-lived two-cent pricing strategy. The evidence in the record suggests that BP experimented with this strategy to determine whether it would boost its profits and, after it quickly became apparent that the strategy was not working, BP abandoned it. There is no evidence that BP's strategy was not only *unsuccessful,* but *unreasonable.* There is, after all, a difference. Every day, businesses experiment with pricing and marketing and inventory and the like. Many of those experiments fail, but that does not mean that the businesses acted negligently in trying them. Without evidence that BP acted unreasonably in trying a new pricing strategy, a jury could not return a verdict for TCS, even if the Court were to agree with TCS that a party to a contract can violate the good-faith covenant while acting in good faith.

For all of these reasons, the Court grants BP's motion with respect to TCS's pricing counterclaim. That counterclaim is dismissed with prejudice and on the merits.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiff's motion for summary judgment [Docket No. 156] is GRANTED IN PART AND DENIED IN PART.

2. The motion is GRANTED with respect to defendant's pricing counterclaim, and that claim is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. The motion is DENIED in all other respects for the reasons stated in the Court's June 1, 2007 Order [Docket No. 185].