**Michelle BEHM, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 00–222C.**

United States Court of Federal Claims.

Filed under seal Oct. 7, 2005.

Reissued Oct. 24, 2005.[1]

opinion is now released to be published in its

Kathleen C. Chavez, Geneva, Illinois, for the plaintiffs.

Hillary A. Stern, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Deborah A. Bynum, Assistant Di-

original form, with some minor, non-substantive corrections.

rector, all of Washington, D.C., for the defendant. Alexandra Randazzo, Office of the Chief Counsel, Federal Aviation Administration, Washington, D.C., of counsel.

### *OPINION AND ORDER*

WOLSKI, Judge.

The plaintiffs Michelle Behm, Frances Mulkey and Katherine Peterson[2] have filed the instant action under the Equal Pay Act ("the Act"), 29 U.S.C. § 206(d) (2000), seeking the difference in pay between what male comparators received and what they have received for equal work.[3] The defendant has moved for summary judgment under the affirmative defense that any pay disparities were due to a "factor other than sex." *Id.* For the reasons that follow, the Court GRANTS the defendant's motion.

### I. BACKGROUND

The plaintiffs are all high-level managers for the FAA. Before 1995, the FAA operated under the standard federal GS plan. *See* Def.'s Supp.App. at 1 (Early Decl. ¶ 3). In November 1995, Congress authorized the FAA to restructure its compensation programs. Pls.' Resp. to Def.'s Prop. Findings ¶ 1. In March 1996, FAA Administrator David Hinson issued general guidelines for the anticipated Personnel Management System. *Id.* ¶ 3. The personnel plan that was approved consisted of three FAA compensation systems: the Core Compensation Plan (CCP); the Executive Plan; and Specialized Plans for FAA employees such as Air Traffic Controllers. *Id.* ¶ 4. The CCP replaced the traditional grade-step system with a pay-band system, in part better to reflect private industry practice. *See id.* ¶¶ 5–6. In the spring of 1998, the National Air Traffic Controllers Association (NATCA) came to an agreement with the FAA over a new specialized pay plan. *Id.* ¶ 7. The NATCA pay plan provided for different compensation treatment depending upon one's employment status as of October 1, 1998. *Id.* ¶ 14.

In a memorandum issued October 1, 1998, FAA Administrator Jane Garvey extended the NATCA pay plan to those managers, supervisors and staff (MSS) then holding positions at FAA field facilities. She based her decision on the "day to day interaction and interdependence of air traffic controllers, managers, supervisors, and staff at field facilities." Def.'s App. at 98. She also justified her actions based on a "direc[t] link[ ]" of these MSS to "the productivity and efficiencies agreed to in the NATCA contract." *Id.* at 99. In other words, because the air traffic controllers (ATCs) under the MSS at field facilities were receiving pay boosts under a NATCA pay plan that was expected to increase productivity and efficiency, it was thought advisable that the MSS overseeing these employees and cost savings should also receive a pay boost. Garvey declined to extend the NATCA pay plan to MSS at regional offices or headquarters (HQ/RO) at that time, wanting first to "review the productivity, efficiency, and pay compression issues for all agency jobs" and to ensure that HQ/RO positions were "properly classified." *Id.* The MSS at HQ/RO positions did not have the same close interaction with the NATCA members who received pay boosts under the plan, and were included in the CCP, which was itself designed to promote efficiency and productivity. *See id.* at 98–99. Garvey expected to decide what to do about the HQ/RO employees "by February 1999." *Id.*

In a memorandum issued March 5, 1999, Garvey finalized her decision to extend the NATCA pay plan only to MSS at field facilities. She reasoned:

> Without a doubt, this is an extraordinarily difficult issue. On the one hand, there is the need for career advancement and retention of personnel within the air traffic organization, which I know is a very real issue for air traffic. But there is also the

---

**2.** Although she is identified as Kathy *Petersen* throughout the complaint, this appears to be a series of typographical errors. *See, e.g.,* Def.'s App. at 277, 286–93; Pls.' Resp. to Def.'s Prop. Findings ¶¶ 49–55, 58–62, 66.

**3.** Plaintiff Nancy Shelton, an original party to the complaint, was voluntarily dismissed from this action on July 17, 2002. Order (July 17, 2002) at 2 ¶ 5 (granting plaintiffs' motion voluntarily to dismiss plaintiff Nancy Shelton).

larger agency issue of equity and fairness for those employees from other lines of business, many of whom work side by side with air traffic managers and staff, often performing similar functions. We must balance the goals and needs of the air traffic organization with corporate objectives and issues facing FAA as a whole.... [¶] As compelling as the air traffic issues are, to deal with them in isolation would be a mistake for the agency as a whole.

Def.'s App. at 105. In May 1999, the FAA issued movement rules for MSS transferring between field and HQ/RO positions, citing the goal of "proper treatment for all individuals." *See id.* at 107. The movement rules established that (1) MSS who made career-enhancing transfers to field positions after October 1, 1998, would be entitled to some but not all NATCA pay plan benefits and related pay raises,[4] *see* Pls.' Resp. to Def.'s Prop. Findings ¶ 27, and (2) MSS who made career-enhancing transfers from field offices to HQ/RO would retain their NATCA pay plan benefits, although they would become incorporated into the CCP, *see id.* ¶¶ 36–37, 42. Accordingly, MSS who were already holding HQ/RO positions and remained there were not entitled to any NATCA pay plan benefits. All three plaintiffs in this action held HQ/RO MSS management positions on October 1, 1998. *Id.* ¶ 29.

The following summarizes the pay rules applicable to this case:

1. If the employee was an MSS at a field facility as of October 1, 1998, he or she became entitled to the benefits stemming from the NATCA pay plan. *See* Pls.' Resp. to Def.'s Prop. Findings ¶ 32.

2. If the employee was an MSS at an HQ/RO facility as of October 1, 1998, and remained there, he or she did not become entitled to the benefits stemming from the NATCA pay plan. *See id.* ¶ 38.

3. If an MSS transferred from a field facility to an HQ/RO and the transfer was deemed "career-enhancing," he or she retained the NATCA pay plan benefits already received, even though subject to the CCP. *See id.* ¶ 42.

4. If an MSS transferred from an HQ/RO to a field facility after October 1, 1998, and the transfer was deemed "career-enhancing," he or she became entitled to some NATCA pay plan benefits. *See id.* ¶ 27.

The plaintiffs concede that the pay differential at issue in this case was caused by these rules, Pls.' Prop. Findings ¶ 1, which are facially gender-neutral, *see* Pls.' Resp. Def.'s Mot. Summ. J. ("Pls.' Opp.") at 16–17 (compensation differences "based on a single factor—where that employee was assigned on October 1, 1998."). They contend, however, that the pay plan and movement rules fail to "serv[e] a legitimate business purpose," *id.* at 15, and thus should not be considered bona fide, gender-neutral factors; and that the plan and rules have not been "implemented in a gender neutral manner." *Id.* at 16.

## II. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Rules of the United States Court of Federal Claims ("RCFC"). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987). Material facts are those "that might affect the outcome of the suit under the governing law." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute over facts is genuine "if the evidence is such

4. The specific details of the pay plan are not relevant for purposes of this motion. Suffice to say, the pay increases were phased in over a three-year period, and MSS had to be designated as field facility employees on each effective date to be eligible to receive each successive benefit. *See, e.g.,* Def.'s App. at 100–03.

that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in a form that would be admissible at trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. The moving party, however, must file with the Court the documentary evidence, such as exhibits, that support its assertions that material facts are beyond genuine dispute, *see* RCFC 56(h), unless it is basing its motion for summary judgment on the "absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548; *see also Anchor Sav. Bank v. United States*, 59 Fed.Cl. 126, 140 (2003).

## B. The Equal Pay Act

The Equal Pay Act provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1). In 1974, Congress extended the Act to cover the federal government, and now:

"Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

*Id.* § 203(d).

■ A prima facie case under the Act requires that the plaintiffs establish the following: (1) a covered employer pays less wages to the plaintiffs than to employees of the opposite sex, (2) for work that requires the same skill, effort and responsibility, and (3) that is performed under similar circumstances. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Lissak v. United States,* 49 Fed.Cl. 281, 284 (2001); *Raymond v. United States,* 31 Fed.Cl. 514, 518 (1994); *Molden v. United States,* 11 Cl.Ct. 603, 604 (1987); *Fallon v. Illinois,* 882 F.2d 1206, 1208 (7th Cir.1989); *see Covington v. S. Ill. Univ.,* 816 F.2d 317, 321 (7th Cir.1987). For purposes of the Government's motion for summary judgment, it is assumed that a prima facie case can be proven by the plaintiff. *See* Def.'s Mot. Summ. J. at 2, 25. The burden then shifts to the defendant "to show that the differential is justified under one of the Act's four exceptions." *Corning Glass Works,* 417 U.S. at 196, 94 S.Ct. 2223; *see also County of Washington v. Gunther,* 452 U.S. 161, 168, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). The defendant proceeds under affirmative defense (iv), "a differential based on any other factor other than sex."

■ But what must a defendant show to prevail under this defense? As our Court has recognized, *see Lissak,* 49 Fed.Cl. at 285, the Circuits disagree on this point, and the Federal Circuit has not yet spoken on the issue. Some Circuits require employers to prove that the identified "factor other than sex" has an "acceptable" or "legitimate" business-related reason behind it. *See Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 525 (2d Cir.1992) (holding employer must prove that "system resulting in differential pay is rooted in legitimate business-related differences in work responsibilities and qualifications"); *EEOC v. J.C. Penney Co.,* 843 F.2d 249, 253 (6th Cir.1988) (requiring proof that factor "was adopted for a legitimate business reason"); *Kouba v. Allstate Ins. Co.,* 691 F.2d 873, 876 (9th Cir.1982) (requiring "an acceptable business reason" for the "factor

which causes a wage differential"). For others, it is enough that the factor be gender-neutral on its face and bona fide—that is, used in good faith and not in a discriminatory manner—in its application. *See Fallon*, 882 F.2d at 1211; *Taylor v. White*, 321 F.3d 710, 717–19 (8th Cir.2003).

The approach of the latter group has two things in its favor. First, there is nothing in the text of the Equal Pay Act that suggests that the "factor other than sex" must be proven to be business related. Second, we have it on good authority that: "Under the Equal Pay Act, courts and administrative agencies are not permitted to 'substitute their judgment for the judgment of the employer ... who [has] established and applied a bona fide job rating system,' so long as it does not discriminate on the basis of sex." *County of Washington*, 452 U.S. at 170–71, 101 S.Ct. 2242 (quoting from 109 CONG. REC. 9209 (1963) (statement of Rep. Goodell)) (alteration in original). As Congress has not called for it, and the Supreme Court has admonished us to avoid it, the type of second-guessing involved in deciding if a factor is suitably business-related is not a proper function of the courts. Accordingly, this Court rejects the gloss placed on the statute by the Second, Sixth, and Ninth Circuits.

■ That is not the end of the matter, however. An employer must prove that the gender-neutral factor it identified is indeed *the* factor causing the wage differential in question. If the factor is a mere pretext used by an employer who intended to discriminate on the basis of gender, then the affirmative defense fails. *See, e.g., Kouba*, 691 F.2d at 876–77; *Covington*, 816 F.2d at 322; *Strecker v. Grand Forks County Soc. Serv. Bd.*, 640 F.2d 96, 103 (8th Cir.1980), *aff'd en banc*, 640 F.2d 96, 109 (8th Cir.1981) (per curiam). As a practical matter, the question of pretext places, at the least, a burden of production on plaintiffs to come forward with evidence that could disprove (or, if you will, prevent the employer from proving) the affirmative defense. At the summary judgment stage, this means evidence from which it may reasonably be inferred that the *real* factor behind wage differentials was *not* the identified "factor other than sex."

■ Evidence that would tend to show an employer's inclination or intent to discriminate on the basis of gender is, of course, highly relevant in this regard. But one supposes that it might be possible to show pretext in another, more circumstantial manner. In the presence of evidence that a particular wage policy was highly disproportionate in its effect on the two genders, it might be appropriate for a court to scrutinize the gender-neutral factor an employer relies upon.[5]

This scrutiny, however, should not entail questioning the wisdom of a particular policy, or whether it actually furthers an identified and acceptable business purpose, for several reasons. In the first place, it is hardly within the competence of the judiciary to decide how a business should be run, and were our defendant a private employer this type of circumstantial inquiry would be inappropriate.[6] But the defendant is instead the United States, whose business is not business, but government. Lacking the profit motive and competitive pressures that influence private employers, it would not be uncommon for government employment policies to reflect characteristics other than good business sense.[7] A government policy that failed to further a legitimate business purpose, then, is more likely due to the fact that its authors were not businessmen, than due to some intent to discriminate.

Thus, the question of whether an employment policy furthers a valid business purpose neither belongs in the courts nor applies to government agencies. Moreover, it would

---

**5.** Disparate impact alone does not violate the Equal Pay Act. *See County of Washington*, 452 U.S. at 170–71, 101 S.Ct. 2242; *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1127 (7th Cir.1987).

**6.** As the Seventh Circuit explained, "it is not our province to second-guess employers' business judgment." *Fallon*, 882 F.2d at 1212 (citing *County of Washington*, 452 U.S. at 171, 101 S.Ct. 2242).

**7.** For one discussion of the institutional differences, see Gordon Tullock, *Economic Hierarchies, Organization and the Structure of Production*, in BUREAUCRACY 280–81, 411–12 (Charles K. Rowley ed., 2005).

seem to involve judicial intrusion into Executive branch policymaking. Government employees typically serve by appointment, not contract, and have their rights determined by laws, regulations, and other manifestations of public policy. *See, e.g., Adams v. United States,* 391 F.3d 1212, 1221 (Fed.Cir.2004); *Todd v. United States,* 386 F.3d 1091, 1094 (Fed.Cir.2004); *Kizas v. Webster,* 707 F.2d 524, 535 (D.C.Cir.1983). Since public policy is being reviewed, the Court holds that it would be appropriate to borrow the standard that is employed when government regulation of employment conditions is challenged—"rational basis" scrutiny. *See, e.g., New York City Transit Auth. v. Beazer,* 440 U.S. 568, 592–93, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 424–25, 72 S.Ct. 405, 96 L.Ed. 469 (1952).

This deferential manner of review applies to the policies of administrative agencies as well as to the acts of legislatures. *See New York City Transit Auth.,* 440 U.S. at 571–72, 99 S.Ct. 1355; *Dandridge v. Williams,* 397 U.S. 471, 473, 483–86, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). And it applies even when it is alleged that a gender-neutral classification has a disparate impact on one gender. *See J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 143, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (explaining that government's use of facially gender-neutral criteria is subject to rational basis scrutiny even if disparate impact is shown); *cf. New York City Transit Auth.,* 440 U.S. at 592–93, 99 S.Ct. 1355 (conducting rational basis review of personnel regulation alleged to have disparate racial impact). Under rational basis review, courts are to exercise restraint and uphold a government policy "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." *Vance,* 440 U.S. at 97, 99 S.Ct. 939. In other words, a government economic or social policy passes this test "if any state of facts reasonably may be conceived to justify it." *Dandridge,* 397 U.S. at 485, 90 S.Ct. 1153 (quoting *McGowan v. Ma-*

*ryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). This is the level of scrutiny that an FAA regulation of private business would receive, and thus appears to be the appropriate manner to approach FAA policies affecting their own employees.

The Court concludes that the determination that an employment policy has no conceivable connection to a legitimate goal of a government agency could be relevant to an Equal Pay Act claim. The relevance of such a finding depends on the existence of facts demonstrating a severely disproportionate, negative impact on a plaintiff's gender. As an example, the policy of paying employees a higher salary if they have an even number of letters in their surnames would appear to be irrational but, by itself, does not bear on an Equal Pay Act claim. If no female employee at the agency met this condition, however, this combination *could* result in a reasonable fact-finder concluding that the intent to discriminate against female employees, and not the policy as such, was the real cause of the resulting pay disparity.

And, as was noted above, if a factor that is gender-neutral on its face is applied in a discriminatory manner, then it may be found that gender *was* the factor causing a pay differential. *See Fallon,* 882 F.2d at 1211; *see also Molden,* 11 Cl.Ct. at 604 (describing the promotion of male employees despite a freeze that prevented female plaintiffs' promotion). Thus, if exceptions to a policy were made for members of the opposite gender but were denied to plaintiffs bringing Equal Pay Act claims, it is possible that the factor causing a resulting pay disparity was not the policy itself, but discrimination in the granting of exceptions to the policy.

**C. Were the Pay Plan and Movement Rules "Factor[s] Other than Sex"?**

The defendant contends that the FAA's extension of the NATCA pay plan concept to field MSS, as implemented by the October 1998 memorandum, the March 1999 memorandum, and the May 1999 movement rules, is a "factor other than sex" that is the cause of the differential in pay between the plaintiffs and their identified male

comparators. There is no dispute that the differential in pay between plaintiffs and their respective comparators was due to the application of the pay plan and movement rules. *See* Pls.' Resp. to Def.'s Prop. Findings ¶¶ 29–78. It is also indisputable that the pay plan and movement rules draw no distinctions between employees based on sex. *See, e.g.,* Def.'s App. at 98–116. Indeed, plaintiffs concede that there are male MSS who were disadvantaged by the plan and rules because they held HQ/RO positions, and female MSS who benefitted because they held field positions. *See* Pls.' Resp. to Def.'s Prop. Findings ¶¶ 30, 32; Tr. (Feb. 7, 2005) ("Tr.") at 37. The pay plan and movement rules are clearly gender-neutral on their face.

Plaintiffs argue, though, that because they have identified male employees who are paid more than they are, the Government must "prove that the FAA Pay Plan and May 25, 1999 Movement Rules served a legitimate business purpose." Pls.' Opp. at 20. Plaintiffs frame the legitimacy question as follows: "was it reasonable (was there an acceptable business reason) for Defendant to determine eligibility for inclusion in the FAA Pay Plan based on where an employee was located on a single day-October 1, 1998." *Id.* at 21. They contend that a report issued by the Department of Transportation's Assistant Inspector General ("IG Report") and affidavits submitted by seven FAA employees (including two of the plaintiffs) create a dispute concerning facts material to this question. *See id.* at 21–22; Pls.' App. Exs. 1–4, 7, 9–11.

But, as was discussed above, the Government does not have to prove that the pay plan and movement rules serve a legitimate business purpose. Under rational basis review, the classifications made by the plan and rules "are valid unless they bear no rational relationship to the [Government]'s objectives." *New York City Transit Auth.,* 440 U.S. at 592 n. 39, 99 S.Ct. 1355 (quoting *Washington v. Yakima Indian Nation,* 439 U.S. 463, 501, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979)) (citation omitted). All that the Government must show is that the plan and rules rationally relate to a legitimate interest, under any conceivable set of facts. *See, e.g.,*

*Vance,* 440 U.S. at 97, 99 S.Ct. 939; *Dandridge,* 397 U.S. at 485, 90 S.Ct. 1153. Moreover, the proper question is not whether it was rational to select October 1, 1998, as the dividing line for full eligibility for pay plan benefits. As the Supreme Court has explained:

> When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the [government] must be accepted unless we can say that it is very wide of any reasonable mark.

*New York City Transit Auth.,* 440 U.S. at 593 n. 41, 99 S.Ct. 1355 (quoting *Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770 (1928) (Holmes, J., dissenting)). The concept of using particular dates to decide benefits is integral to seniority systems, which are absolute defenses under the Equal Pay Act, 29 U.S.C. § 206(d)(1)(i), and the use of this particular date in the NATCA pay plan was upheld by our Court in *Lissak. See* 49 Fed.Cl. at 285–87.

### 1. Do the Pay Plan and Movement Rules Have a Rational Basis?

The differences in pay between plaintiffs and their male comparators were the result of the manner in which the NATCA pay plan concept was extended to cover Air Traffic management, supervisors, and staff (which will hereinafter be referred to as the "AT pay plan"). These were not the result of ad hoc pay decisions, but the application of a policy formally announced by the FAA's Administrator. *See* Def.'s App. at 98–106; Pls.' Resp. to Def.'s Prop. Findings ¶¶ 17–25. In 1998, the FAA and NATCA negotiated a collective bargaining agreement under which members of the Air Traffic Controllers' union

were to have their salaries substantially increased. The base salaries of controllers increased by some twenty-four to forty-seven percent within three years. *See* Pls.' App. at 50. The agreement included the distribution of $200 million to controllers, phased-in over three years and received by employees who were employed on the first day of three successive fiscal years. *See* Def.'s App. at 65–66, 96–97.

The Administrator described the NATCA pay plan as "a new pay system in air traffic that recognizes the relative complexity of jobs, creates career progression incentives, reduces current pay compression problems and provides for productivity and efficiency improvements." Def.'s App. at 98. But when massive pay increases were promised the Air Traffic Controllers, the FAA administrative personnel who oversaw and worked alongside these union members, at field locations, became concerned about their relative pay parity. The Administrator recognized, "[t]here are clear linkages among the air traffic controller workforce and field facility managers, supervisors, and staff." *Id.*

On the other hand, there were other air traffic administrative personnel who did not work directly with the union members, but instead were employed at regional offices and the FAA's headquarters. The Administrator noted, "[t]here are also linkages between facility personnel and regional office and headquarters staff. This means that we must balance pay equity issues within the air traffic line of business as well as across organizational lines." *Id.* In other words, in working out the issues of pay equity, the Administrator had three relationships to keep in mind: the relationship between field facility MSS and the union Air Traffic Controllers whose pay was substantially increasing; the relationship between the field facility MSS and their air traffic counterparts at HQ/RO positions; and the relationship between air traffic MSS and other administrative personnel working for the FAA. A Core Compensation Plan had been developed the previous year to apply to personnel not covered by a specialized plan. *See* Pls.' Resp. to Def.'s Prop. Findings ¶¶ 5–6; Def.'s App. at 13, 33–34.

In the October 1, 1998 memorandum, the Administrator explained:

> Because of the day to day interaction and interdependence of air traffic controllers, managers, supervisors, and staff at field facilities, we have decided to extend the NATCA agreement to those managers, supervisors, and staff in field facilities. These managers, supervisors, and staff are directly linked to the productivity and efficiencies agreed to in the NATCA contract.

Def.'s App. at 98–99. The FAA "decided not to include" the HQ/RO personnel in the AT pay plan "at this time," stating, "[b]efore we implement any pay changes in the regional or headquarters offices we must review the productivity, efficiency, and pay compression issues for all agency jobs." *Id.* at 99. The Administrator "believe[d] that at the regional office and headquarters we must consider all jobs and the impact on the entire agency before we implement any changes." *Id.*

In a memorandum issued November 30, 1998, the Administrator further explained: "Our goal in establishing the new pay plan for field MSS was to recognize the relative complexity of the work, create career progression incentives, reduce current pay compression among field MSS, and provide for productivity and efficiency improvements." Def.'s App. at 100. Among other concerns that were noted was "that appropriate pay relationships are maintained between field MSS and controllers." *Id.* In two documents issued the following March, the Administrator explained the FAA's decision not to include the HQ/RO MSS in the AT pay plan. *See* Def.'s App. at 104–06; Pls.' Resp. to Def.'s Prop. Findings ¶¶ 23–25. She noted "the larger agency issue of equity and fairness for those employees from other lines of business, many of whom work side by side with air traffic managers and staff, often performing similar functions," Def.'s App. at 105, and concluded that "[a]s compelling as the air traffic issues are, I feel it would be a mistake to deal with them in isolation for the agency as a whole." *Id.* at 106. The Administrator distinguished the field MSS circumstance by noting "substantial productivity gains" due to the NATCA agreement, and asserted "it is essential that before approving

any pay changes, we identify significant productivity and efficiency improvements." *Id.*

On May 25, 1999, the FAA issued its "Movement Rules." These concerned the ability of MSS who transfer from HQ/RO to field positions to be eligible for the AT pay plan benefits, and the ability of MSS who transfer from the field to HQ/RO to retain those benefits. Def.'s App. at 107–16; *see also* Pls.' Resp. to Def.'s Prop. Findings ¶¶ 26–28. The upshot of these rules is that an employee whose transfer from an HQ/RO to a field position is considered a promotion would participate in the benefits distributed the next October 1, and that an employee whose transfer from a field to an HQ/RO position is considered a promotion or a career progression move would retain his or her pay (including the boosts due to the AT pay plan benefits).

Thus, the FAA identified a number of interests it sought to further by adopting the AT pay plan and movement rules for MSS in field positions, and for keeping the other MSS in the Core Compensation Plan. It felt the cause of pay equity was served by giving field facility MSS the same sort of pay increases that were received by the controllers they worked with. The FAA also thought the work of the former was related to the productivity and efficiency gains from the pay plan covering the latter. On the other hand, pay equity between the MSS working in HQ/RO positions and the other FAA employees (who worked alongside them in similar positions) was to be preserved by keeping them together in the same pay plan, as no productivity or efficiency gains had yet been identified that would support extending the AT pay plan to the former. The movement rules served the cause of pay retention, which in turn facilitated career advancement.

Given these legitimate, competing goals, was it irrational for the FAA to have adopted the approach it did? If the union members were receiving substantial pay increases, the FAA could have rationally thought that comparable pay raises for the managers, supervisors and staff who worked closely (functionally and physically) with the union members were appropriate. And since the FAA has to operate within a budget, it could decide that similar pay raises for other personnel were not appropriate in the absence of offsetting productivity or efficiency gains. These goals have already been found legitimate by our Court, in scrutinizing the NATCA pay plan in the context of an Equal Pay Act claim. *See Lissak,* 49 Fed.Cl. at 287 ("[A]n employer's attempt to minimize cost is a valid business reason for implementing a pay and classification system."). And given finite resources, the movement rules were rationally related to the interest in facilitating career progression of FAA employees— absent the pay retention policy, field facility MSS would have a disincentive to accept promotions to HQ/RO positions, and allowing only transferees to MSS field positions who were being *promoted* to share in subsequent AT pay plan benefits provided an incentive for employees to use their experience in more important positions.

Any policy choice by an Executive agency is, of course, debatable. Plaintiffs submit affidavits from several FAA employees opining on the wisdom of the AT pay plan and questioning whether it serves a legitimate purpose. *See, e.g.,* Pls.' App. Ex. 1, ¶¶ 26–37, 41, 45–47 (Mulkey Aff.); Pls.' App. Ex. 2, ¶¶ 27–41, 45–51 (Behm Aff.); Pls.' App. Ex. 4, ¶¶ 27–34, 37–39, 43–45 (Brown Aff.). These opinions stress the damage to the morale of HQ/RO employees who are paid less than their subordinates in field positions, and less than their peers if they transferred to a field position after October 1, 1998.[8] The resulting dissension is understandable and, indeed, predictable. The IG Report, written at the request of several members of Congress, confirms that the AT pay plan has resulted in pay inequities among FAA employees in the Air Traffic area of the agency. *See* Pls.' App. Ex. 7. This report, however, does not look at the pay inequities between MSS in HQ/RO positions and other FAA personnel that would have resulted if the ATT pay plan

---

**8.** "Pay compression" occurs when the gap between the pay of a position of higher and lower responsibilities narrows over time due to unequal rates of increase. When subordinates' pay ends up exceeding that of supervisors, this is called "pay inversion." *See Averi v. United States,* 23 Cl.Ct. 127, 130 n. 5 (1991).

extended to the former but not the latter. And it does not measure the cost of giving comparable pay raises to all FAA employees across-the-board. These are all competing considerations that had to be weighed by the FAA.

In any event, one can certainly argue that, in retrospect, the AT pay plan caused more harm than good. And one could have argued against the adoption of this policy based on the predicted dissension and inequities that would ensue. But an employment policy does not become an Equal Pay Act violation merely because not everyone agreed with it, or because it turned out to be less valuable (or even injurious) to the goals of a government agency than the policymakers believed would be the case. It is not the task of the courts to review the good sense or the policy decisions inherent in an agency's selection of one pay plan over another. Our Courts "do not sit as a kind of super-personnel department weighing the prudence of employment decisions." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997) (internal quotation marks omitted). Perhaps it was unwise for the FAA to have agreed to give the $200 million to the Air Traffic Controllers, which triggered the chain-reaction. Perhaps it would have been better to create a moderate level of alienation throughout the ranks of the non-Air Traffic employees rather than the intense level of alienation between the HQ/RO MSS and their counterparts in field facilities. But these are all policy considerations, and should not be determined in the courts. The AT pay plan does not fail rational basis review.

Moreover, the severe disproportionate effect of the policy on a gender that would make the rational basis of the AT pay plan relevant to the question of discriminatory intent has neither been alleged nor supported. The closest the plaintiffs come to this is their allegation that the AT pay plan "results in pay disparity for women because before October 1, 1998 the Agency had made a great effort to help women get to the regional office and Headquarters for career advancement. Therefore, these women will never receive the same pay as the men they worked with in the field before October 1, 1998." Pls.' App. at 23 (Behm Aff. ¶ 42); *see id.* at 12–13 (Mulkey Aff. ¶¶ 38–39). But this is evidence of irony, not of any scheme on the part of Ms. Garvey to discriminate against female employees.

And it was conceded that female employees were advantaged and male employees hurt by the AT pay plan. Tr. at 37. One affidavit submitted by plaintiffs is from a male FAA employee, Douglas Powers, who states, "I have been personally affected by non-inclusion from the FAA Pay Plan." Pls.' App. at 102 (Powers Aff. ¶ 24). Two examples that the IG Report gives to illustrate the pay plan's inequities concern male employees receiving lower pay than their subordinates. *See* Pls.' App. at 55, 62. Conceding that some males were paid less than females due to the AT pay plan, plaintiffs have taken the position that this means both men and women would have valid Equal Pay Act claims. Tr. at 27–28; *see also id.* at 37. But the statute is not the "Pay Everyone Exactly the Same Act." If both male and female employees are paid less than comparators of the opposite sex, this by definition seems to be due to a "factor other than sex." Nothing about the poor results of the AT pay plan supports a reasonable inference that it was adopted as a pretext for gender discrimination.

*2. Were the Pay Plan and Movement Rules Applied in a Discriminatory Manner?*

As was discussed above, although the AT pay plan and the movement rules are gender-neutral on their face, their application in a discriminatory manner could violate the Equal Pay Act. If the FAA made exceptions for male employees but not female employees, so that male employees who otherwise would not have qualified for the benefits of the plan and rules were to receive them nevertheless, then it may not be the case that a "factor other than sex" was truly the cause of the resulting pay disparity. Rather, the source could be the policy of granting exceptions which, if it were not itself gender-neutral, could violate the Equal Pay Act—if the plaintiffs were denied similar exceptions.

Plaintiffs to this end attempt to show a dispute of material facts by identifying a total of sixteen male FAA employees for whom they allege exceptions were made. These allegations are made in affidavits submitted by plaintiffs Mulkey and Behm, Pls.' App. Exs. 1–2, and in affidavits of other FAA employees that were apparently prepared for an Equal Employment Opportunity Commission (EEOC) proceeding brought by Behm. *Id.* Exs. 3, 4, 9–11. But after reviewing these affidavits, and the declarations and documents submitted by the government in support of its motion, and reasonably construing these in the light most favorable to the plaintiffs, the Court finds no evidence that could prove a claim of discriminatory application of the plan and rules.

Five of the male employees identified in plaintiffs' papers were included in the AT pay plan because their position of record was at a field facility on one of the qualifying dates, although they were physically on detail at a regional office or headquarters. These employees—Messrs. Krieger, Hubbard, Boggs, Dudley, and McClelland, *see* Pls.' App. Ex. 1 ¶ 18 (Mulkey Aff.); *id.* Ex. 2 ¶ 18 (Behm Aff.)—did not benefit from an exception, but from the FAA's policy of considering an employee's position of record and not his or her detail assignment in determining whether to include that employee in the AT pay plan. *See* Def.'s Supp.App. at 98–114, 122–30. There is no evidence that this policy discriminated on the basis of gender. To the contrary, the government identifies six female employees who were on detail at a regional office or headquarters but were included in the AT pay plan due to their field positions of record. Def.'s Supp.App. at 86 (Yoo Decl.).[9] Plaintiffs have pointed to no evidence to dispute this.

One supposes that the practice of detailing employees could have been abused or manipulated by the FAA to improperly include male employees in the AT pay plan. But no evidence has been identified to support such a supposition. Boggs had been on detail at a regional office since the year prior to the AT pay plan's creation. Def.'s Supp.App. at 108

(Boggs Decl.). When the details of Hubbard and Krieger ended in August, 1999, instead of keeping a field position of record for two additional months to receive the October, 1999 AT pay plan raise, each transferred to a regional office position and exited the AT pay plan. *Id.* at 110 (Hubbard Decl.), 114 (Hubbard SF 50–B); *id.* at 99 (Krieger Decl.), 103 (Krieger SF 50–B). McClelland was on detail at a regional office on October 1, 1998, because a previous detail was extended at the end of June, 1998—even before the NATCA pay agreement was formalized and several months before the AT pay plan was adopted. *Compare id.* at 123 (McClelland Decl.), 127 (McClelland SF 50–B), *with* Def.'s App. at 68–69 (agreements signed on July 8 and 9, 1998), 98–99 (AT pay plan announced October 1, 1998). By mid-March, 1999, McClelland returned to his field position of record. Def.'s Supp.App. at 123 (McClelland Decl.).

One of the plaintiffs attempts to cast suspicion on the treatment of Mr. Dudley, stating that after moving to a field position entitling him to inclusion in the AT pay plan, "[a] relatively short time later [he] came back to the Regional Office and was allowed to stay on the field position of record so his pay would not be affected negatively." Pls.' App. Ex. 1 at 8 (Mulkey Aff.). But the more specific declaration from Dudley explains that this "relatively short time" was in fact *sixteen months later,* and that his return to a regional office was "for about a two or three week time period on a detail basis." Def.'s Supp.App. at 105 (Dudley Decl.). The rest of the time, from late September, 1999 to the present, he has held field positions and was physically located at field facilities. *Id.* at 104–05. From the circumstances of Dudley and the other four employees who were on detail, no reasonable inference may be drawn supporting the allegation of discriminatory treatment.

Two other male employees for whom it is alleged "exceptions were made," Messrs. Holland and Tellier, *see* Pls.' App. Ex. 9 ¶ 18 (Gowans Aff.), are not, upon closer inspection, even accused of benefitting from excep-

**9.** *See also* Def.'s Supp.App. at 67 ¶ 8 (Martin Decl.) (describing inclusion in AT pay plan of female employee who was on detail at a regional office on October 1, 1998).

tions to the plan and rules.[10] Instead, plaintiffs' affiant states that under the movement rules, they were able to transfer to Regional Office positions and retain their AT pay plan salaries and then some. *Id.* ¶ 20.

The evidence identified does not support the allegation that eight of the other nine male employees benefitted from any "exceptions" to the pay plan and rules. One plaintiff alleges that two male employees who held field facility positions on October 1, 1998, and thus were included in the AT pay plan—Joseph Foster and John Stewart—swapped a transfer assignment to a regional office. Pls.' App. Ex. 1 at 6 ¶ 18 (Mulkey Aff.). According to Ms. Mulkey, Stewart "elected to go to the region and not get the next two portions of the raise," and Foster was treated as if "he never went to the regional office," although he reported there "for several weeks." *Id.* But this accommodation does not add up to an "exception" to the pay plan. Mulkey admits that Foster held a field position on October 1, 1998, and was thus eligible for inclusion in the pay plan, *see id.;* she acknowledges that Stewart did not leave his field position until after October 1, 1998, *see id.; see also* Def.'s Supp.App. at 91 (memorandum dated October 6, 1998, selecting Stewart for the regional office position); and she stated that only Foster, who held a field position for the next two pay plan milestones, received the subsequent benefits. *See* Pls.' App. Ex. 1 at 6 ¶ 18 (Mulkey Aff.).

Concerning two other male employees of the FAA, Thomas Denny and Stephen Lloyd, plaintiffs merely state the conclusion that an exception was made for them. Pls.' Proposed Findings ¶¶ 21, 23, Pls.' App. Ex. 3 ¶¶ 19–23 (Lease Aff.); *id.* Ex. 10 ¶¶ 17–18 (Jones Aff.). No facts supporting these conclusions are identified.[11] Such bare statements are insufficient to demonstrate a genuine dispute over a material fact. *See Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 164 (Fed.Cir.1985) ("[M]ere allegations by declaration or otherwise do not raise issues of fact needed to defeat a motion for summary judgment."); *see also Shaboon v. Duncan,* 252 F.3d 722, 736 (5th Cir.2001) ("[U]nsupported affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment.") (quoting *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.,* 922 F.2d 220, 225 (5th Cir.1991)); *Shank v. William R. Hague, Inc.,* 192 F.3d 675, 682 (7th Cir.1999) ("[S]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment.") (quoting *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir. 1993)).

The same unsubstantiated conclusion of an "exception" is stated for a third FAA employee, Donald Bringmann. Pls.' Proposed Findings ¶ 22; Pls.' App. Ex. 4 ¶¶ 19–23. Such a bare statement is insufficient, for the reasons just stated. Moreover, the government has submitted documentary evidence showing that Bringmann's transfer to a regional office position, which was to have occurred just prior to the October 1, 1998 AT pay plan milestone, had been delayed for two weeks because he was still needed at the field position. Def.'s Supp.App. at 131–32. The paperwork that had been processed showing his move to a regional position prior to October 1 was not immediately corrected, and thus he was initially excluded from the AT pay plan. This was subsequently corrected, which may have given rise to the impression that an exception was made for Bringmann. Incidentally, similar treatment was afforded a female FAA employee, Lynda Otting, who was to transfer from a field position to a regional office position as of September 13, 1998, but did not report until October 10, 1998. A retroactive correction was made to include her in the AT pay plan, as well. *See* Def.'s Supp.App. at 68–69 (Martin Decl.), 83–85 (Otting SF 50–Bs). The Bringmann example is thus neither an excep-

---

**10.** A third employee similarly identified by Gowans, Barry J. Davis, is also discussed in the Jones Affidavit and is treated below.

**11.** Mulkey also states that the FAA decided to transfer Denny to a field position in September, 2000, in time for him to receive the October 1, 2000 AT pay plan salary increase. She does not allege that an exception to the plan or rules was involved. *See* Pls.' App. Ex. 1 at 3–4 (Mulkey Aff.).

tion nor evidence from which gender discrimination may reasonably be inferred.

One plaintiff alleged an exception concerning Harold Gausman, based on his physical location at a regional office on October 1, 1998. Pls.' Ex. 1 at 7–8 (Mulkey Aff.). The "exception" appears to be that Mr. Gausman was allowed to keep his field position of record while using office space in a regional office, and thus qualified for the AT pay plan. But Mr. Gausman explained that he held the field position of Support Manager for the Atlanta Tower, "overseeing the building of a new air traffic facility," and was occupying a desk in the regional office building only because of a lack of space at the Atlanta Tower—once rooms became available in trailers at the facility being constructed, in 1999, he moved into them. Def.'s Supp.App. at 120–21 (Gausman Decl.). Plaintiffs have not identified any evidence disputing that the work Gausman was performing in 1998 pertained to his field position of record. His inclusion in the AT pay plan was not due to an exception.

Plaintiffs also claim that an exception was made for Ronald Liszt. Pls.' App. Ex. 1 at 6 (Mulkey Aff.). As Mr. Liszt worked in a regional office position on October 1, 1998, he did not participate in the first distribution of AT pay plan benefits. According to Mulkey, he was subsequently selected for a field position prior to one of the October 1 milestones,[12] and thus was given AT pay plan benefits even though "he was not required to report to [the field location] until January of the following year." Pls.' App. Ex. 1 at 6 (Mulkey Aff.). Mulkey alleges, "[h]e continued to work in the Regional Office with the rest of us branch managers for four months, but at a higher pay." Id. at 6–7.

But defendant submitted documentation showing that Liszt was selected for the field position on September 9, 1999, with an effective start date of September 12, 1999. Def.'s Supp.App. at 118. According to Liszt, his reporting date was extended until November 16, 1999, at his request, to give his family time to relocate. Id. at 116 ¶ 4 (Liszt Decl.).

The November 16, 1999 reporting date is corroborated by documentation. See id. at 119 (form dated Nov. 2, 1999). In the face of this documentation, Mulkey's allegation that an exception was made allowing Liszt to work for four months in a regional office position while receiving AT pay plan benefits fails to create a genuine issue of fact. Cf. Chore–Time Equip., Inc. v. Cumberland Corp., 713 F.2d 774, 779 (Fed.Cir.1983) (affidavit's conclusions that are contradicted by specific evidence cannot create genuine issue). Under the normal application of the AT pay plan, Liszt received benefits because his position of record on a milestone day was in a field facility, and the short delay in his reporting to the facility was due to relocation difficulties.

Plaintiffs claim that the opposite sort of exception was made for Barry J. Davis. Davis was working in a field office position on October 1, 1998. Plaintiffs allege that Mr. Davis "was hired into a regional position in August 1998" but his move "was delayed until after October 1, 1998 for the sole purpose that he could be included in the FAA Pay Plan ..." Pls.' App. Ex. 10 ¶ 20 (Jones Aff.). But Davis explains that it was not until June of 1999 that he applied to transfer to a regional office position, that he was told "[a]round October 1999" that he was selected for the position, and that he stayed on in the field office until January 2, 2000. Def.'s Supp.App. at 94 ¶ 3 (Davis Decl.). This, too, is supported by documentation. See Def.'s Supp.App. at 97 (Davis SF 50 showing January 2, 2000 effective date for regional office position and identifying date of application as June 30, 1999). At any rate, it is not disputed that Davis participated in the AT pay plan when he held a field position, and left it when he assumed a regional office position, and thus no exception is at issue.

Plaintiffs would have the Court infer that special treatment was provided to Liszt, in that he was considered to hold a field position before he reported to it; and also to Davis, in that he was not required to report to a regional position until (three months)

---

12. The affidavit is ambiguous on the date, identifying it as "October 1 (1999 or 2000?)." Pls.'

App. Ex. 1 at 6 (Mulkey Aff.).

after an AT pay plan milestone had passed; and that their gender was the reason for this treatment. But plaintiffs have not claimed that any female employees who transferred from a regional office position to a field facility position had been selected before a milestone date but had the effective date delayed until after that date; or that any female employees transferring from a field facility position to a regional office position were not allowed adequate time for relocation and thus had to change positions right before a milestone date. And there is the contrary example of Ms. Otting, described above. *See* Def.'s Supp.App. at 68–69 (Martin Decl.), 83–85 (Otting SF 50–Bs). Moreover, Ms. Behm was herself transferred to a field facility position, via promotion, on June 20, 1999, in time to benefit from an August 1, 1999 AT pay plan milestone date, and remained in the plan to receive the subsequent benefits. *See* Pls.' Resp. to Def.'s Prop. Findings ¶¶ 40–41; Def.'s App. at 166 (Behm SF 50–B).

In other words, plaintiffs have not identified any female employees who were in similar situations to any of the male employees alleged to have received exceptions, who requested the same treatment, and who were denied it. While plaintiffs allege such things as that the same "opportunity was not afforded to women branch managers," or that one "did not see this type of special consideration for any women," or that a particular plaintiff "was not supported in my attempts to move back to field positions," Pls.' Ex. 1 at 7 (Mulkey Aff.), these vague claims fall far short of stating that consideration was rejected or requests were denied. With no female employee who, unlike Liszt, was approved for a transfer to a field position but had the effective date delayed, until she reported (after a milestone date); or who, unlike Davis, was unable to delay the effective date of her transfer to a regional office position until she reported; there is simply no basis to infer that the processing of their respective transfers involved any special treatment due to gender.

There was one FAA employee whose treatment could be considered an exception to the normal application of the plan and rules. That individual, David Shuler, held a position in a regional office on October 1, 1998, and was thus excluded from the AT pay plan. But Mr. Shuler had apparently requested to be detailed rather than re-assigned when he was transferred from a field position, and had been denied this request prior to the adoption of the AT pay plan. *See* Def.'s Supp.App. at 4 (Early Decl.). Similarly-situated employees were detailed, however. After the Administrator's decision in March, 1999, not to extend the AT pay plan to regional office MSS, Shuler contacted his representative in Congress to complain about his exclusion. *Id.* His situation was then brought to the Administrator's attention, and it was decided that since he would have been in the AT pay plan had his request for a detail been granted, his record was corrected to convert his regional office assignment to a detail. *Id.* The FAA's executive staff then investigated "whether any other individual had been in similar circumstances to warrant change of their personnel actions," and determined there was none. *Id.* Nothing from the circumstances of Mr. Shuler's inclusion in the AT pay plan supports the conclusion that gender was a factor.

In sum, plaintiffs have failed to identify evidence to support a claim that the AT pay plan and movement rules were applied in a manner that discriminated against them based on their gender. No genuine issue of material fact has been established by plaintiffs, and thus summary judgment for defendant is GRANTED.

## III. CONCLUSION

The FAA's AT pay plan and movement rules are gender-neutral on their face, and are rationally related to legitimate government interests. No evidence has been identified that could prove that exceptions to the plan and rules based on gender were the cause of any pay disparities suffered by plaintiffs. Thus, no evidence supports plaintiffs' claims of Equal Pay Act violations. The wage differentials at issue having been caused by a "factor other than sex," the defendant's motion for summary judgment is

hereby GRANTED. The Clerk is directed to enter judgment in favor of the United States.

**IT IS SO ORDERED.**